Mairin DOYLE; Brian Doyle; and Margaret Doyle, Plaintiffs,

v.

ARLINGTON COUNTY SCHOOL BOARD; Arthur W. Gosling; John S. Davis; Virginia Department of Education, Defendants.

Civ. A. No. 89–1416–A.

United States District Court,
E.D. Virginia,
Alexandria Division.

Sept. 9, 1992.

Victor M. Glasberg, Alexandria, Va., for plaintiffs.

Thomas J. Cawley, Grady K. Carlson, John F. Cafferky, Hunton & Williams, Fairfax, Va., Mary Sue Terry, Atty. Gen. of Va., Joan W. Murphy, Asst. Atty. Gen., Richmond, Va., for defendants.

## MEMORANDUM OPINION

HILTON, District Judge.

This case is before the Court on remand to address each relevant factual finding made by the local hearing officer in his initial decision, and explain why, under the due weight standard, it has chosen to accept or not accept that finding. 953 F.2d 100. The Court made findings of fact in its previous opinion and adopts those findings for the purpose of addressing the findings of the hearing officer in this opinion.

In addition to reviewing the administrative record and findings, this Court has personally heard the testimony of all relevant witnesses. Eight witnesses testified for the parents at the administrative hear-

ing. The parents re-called all but one of those witnesses at trial. The only parents' witness who did not reappear was Marla Brazier. Her administrative testimony had been limited to describing Mairin in the Lab School of Washington ("LSW") program. The school presented the testimony of Dr. Lynn Lang and learning disabilities teacher Charlotte Albright, about the school system's proposed Nottingham program, and its appropriateness for Mairin.

In determining the relative weight to be given to the testimony of the witnesses, this Court has considered that all the parents' witnesses have a record of testifying against school systems. Dr. Jeannie Johns, six years Psychological Services Director at LSW, has testified to support LSW funding in at least thirty cases. Karen Duncan, an LSW Academic Director, has indicated that testifying was part of her job, and she had done so "hundreds" of times before. Laura Solomon, an educational consultant, testified that a large part of her business consists of LSW referrals. She indicated that testifying was one of her special skills, and that she had testified in about fifty special education cases—always against public school systems. Solomon had also written over one hundred evaluation reports, and her conclusion was always the same. The public program at issue was inappropriate.

The parents' educational witnesses had little first-hand knowledge of Mairin, and almost no knowledge of the school system's proposed Nottingham program. The witnesses were not the teachers or therapists who actually worked with Mairin at LSW. Karen Duncan had never taught or tested Mairin. Dr. Carol Kamara, LSW speech therapy supervisor, admitted that she had never worked directly with Mairin. At the time of trial, Dr. Jeannie Johns had not seen Mairin at LSW in over fourteen months.

Laura Solomon's contact with Mairin had been a few sessions to write her "evaluation" report, plus a few incidental encounters at LSW while observing other children. At the time of trial, that report was almost fourteen months old. The Court of Ap-

peals apparently believed that Ms. Solomon had been one of Mairin's teachers, and was identified as Dr. Solomon. 953 F.2d at 104. Actually, she had never taught Mairin, nor does Ms. Solomon hold a doctoral degree.

None of the parents' witnesses had ever taught any class like that at Nottingham. Laura Solomon's public school experience was limited to a brief stint as a teacher in a preschool day care center. Karen Duncan had never taught a Learning Disabilities, self-contained class, as the school system has proposed. Carol Kamara provides actual therapy to no students at LSW.

The school system's witnesses, Dr. Lynn Lang and Ms. Charlotte Albright, had not worked with Mairin on a daily basis. However, they had studied the evaluation reports, talked with the parents and with LSW staff, formally tested Mairin during several sessions, and observed her at LSW several times. The school system witnesses were familiar with the Nottingham class. Ms. Albright, the teacher Mairin would have had at Nottingham, described the instruction she provides. Her experience teaching other Learning Disabled youngsters at Nottingham provided a foundation for her conclusion that she could meet Mairin's needs in her class. Her testimony was that she has successfully taught students with poorer educational skills than Mairin. Dr. Lang specializes in developing programs to help Learning Disabled students like Mairin to read. She has also taught at Nottingham for several years. She likewise expressed the opinion that the Nottingham class could meet Mairin's needs in the least restrictive environment.

In addition to having the opportunity personally to observe the witnesses, this Court has available more evidence than the local hearing officer. An audio-tape of Mairin herself, a number of additional reports about Mairin, and an updated school system IEP were received in evidence.

■ The substantive question before this Court is the same as that which was before the local hearing officer. That is, whether the school system's offered program will provide Mairin with a "free appropriate

public education." *Board of Education v. Rowley*, 458 U.S. 176, 206–07, 102 S.Ct. 3034, 3050–51, 73 L.Ed.2d 690 (1982). Once an appropriate program is offered by the public school system, further enhancements are not required. *Matthews v. Davis*, 742 F.2d 825, 830 (4th Cir.1984). Moreover, where a school system proposes an appropriate program, it has no duty to consider non-public programs. *Hessler v. State Board of Education*, 700 F.2d 134, 138 (4th Cir.1983). Thus, the issue is *not* whether LSW is better, or even appropriate, but whether the school system is offered an appropriate program.

■ The local hearing officer, however, framed his inquiry as a comparison of the LSW and Nottingham programs. In the opening paragraph of his decision, he states, "the APS contends that the child's needs can be served most appropriately in a self-contained classroom for learning disabled students at a neighborhood public elementary school." Thus, the section of his decision devoted to "Findings of Fact" discussed only the LSW program, but had not a word about the Nottingham program proposed by the school system. The hearing officer concluded that Mairin's needs could be met best by the staff at the Lab School. In deciding that he felt LSW was most appropriate or best for Mairin, the local hearing officer failed to apply the proper standard.

From reading the local opinion, one would think that the school system's proposed Nottingham program, and that which Mairin received at LSW, were radically different, as a regular classroom versus a residential school would be. In fact, there are no material differences between these two programs which favor LSW. Some aspects of the school system's proposed program are superior to those offered by LSW. At Nottingham, Mairin would be in a regular community school, and would have the opportunity to interact with non-handicapped students for a portion of her non-academic activities.

Offering an "appropriate" program does not, of course, require the school system to duplicate each aspect of a private school program, but a comparison of the programs demonstrates that Nottingham is an appropriate program.

| LSW | Nottingham |
|---|---|
| 1. teacher certified in L.D. | teacher certified in L.D. |
| 2. two classroom aids (master's degree) | one classroom aid (master's degree) |
| 3. structured, self-contained class | structured, self-contained class |
| 4. 11 students (Mairin plus 1 other girl), ages 10–13 | 9 students (Mairin plus 1 other girl), ages 11–13 |
| 5. functional levels: 1–4.8 grade level in math, 1.6–3.4 in reading | functional levels 1–5 grade level in reading and math |
| 6. Mairin's skills at "rock bottom" | Mairin would not be the lowest functioning student |
| 7. related services provided both in therapy room and in classroom | related services provided both in therapy room and in classroom |
| 8. Occupational therapy consultation to teacher, but no direct therapy | occupational therapy/once per week for 30 minutes, plus consultation to classroom teacher |
| 9. one-to-one instruction for 30 minutes per day | one-to-one instruction, as appropriate, for up to 25 minutes per day |
| 10. "Media Center," including taped books | library including taped books |
| 11. integration of related services into overall program informal consultations | integration of related services into overall program by frequent informal meetings, formal student study committee meetings, IEP meetings, sharing written information, special education staff meetings |
| 12. "experiential" approach | "experiential" approach |

The local hearing officer's decision found that Mairin is finally comfortable at Lab after over four years of sustained effort by the teachers there. Even if she could be acclimated at Nottingham, APS would have to move her again the next year, which surely would be another unsettling development for the child.

The evidence, however, simply does not support the apparent implication that moving to Nottingham would somehow be a problem for Mairin.

Indeed, Mairin's former LSW teacher described change as having a positive value for her. When asked about Mairin's transition to another classroom, she stated, "she would benefit from another teacher, another way of approaching tasks, a change of classrooms, a change of peer group."

Moreover, Mairin dealt with numerous changes and transitions during the time she was at LSW. For example, between the 1988–89 and 1989–90 school years alone, every one of Mairin's seven teachers changed, and Mairin moved to a new classroom as well. After the 1990–91 school year, Mairin moved out of LSW entirely. As students grow older, move, or have evolving needs, change is inevitable. The need to change schools cannot itself be a sufficient reason to invalidate the school system's appropriate Nottingham program.

In fact, it appears that Mairin would actually benefit from trying a different approach than that which was largely unsuccessful at LSW. At the time of trial, Mairin had attended LSW for five years. Yet in her most significant area of need, reading, she had made no progress. Her most recent reading scores at LSW were: 1.6 grade level (5/88); 1.7 grade level (2/89); and 1.6 grade level (10/89). At trial three different parents' witnesses admitted that Mairin still could not read.

The local hearing officer's prediction that the school system "would have to move her again the next year," was incorrect. The local administrative hearing concerned the school system's proposed program for 1988–89, which was Nottingham Elementary. When that proposal came up for annual review for 1989–90, it is undisputed that the offer was the same, Nottingham. The local hearing officer's belief that Mairin would have been forced to move from Nottingham the next year, was simply wrong. His finding to that effect cannot be followed.

The local hearing officer found that at the Lab School, Mairin has a peer population of similarly situated language impaired children (within an unusually high percentage of girls). That she does not feel different from the rest of her classmates, who have many of the same problems to work on as does she. At Nottingham, the difference between Mairin and everyone else would be vast. They are self-directed; she is constantly distractible and dependent on teachers. They are functioning higher academically and making more or less steady progress. She is behind all of them and to make any progress would require a great effort on her part. Finally, they have well developed social poise, whereas Mairin is only this year beginning to develop such skills. None of these statements can survive comparison to the evidence in the record.

The local hearing officer's belief that Mairin's class had "an unusually high percentage of girls" is both inaccurate and irrelevant. There is one girl in the Arlington class and one girl in the LSW school class, and it is very common in a learning disabilities class to have more boys than girls.

More importantly, the ratio of boys to girls is not a factor which can determine whether a class is appropriate for a student. Indeed, the U.S. District Court for the Eastern District of Virginia rejected this exact argument in *Bales v. Clarke*, 523 F.Supp. 1366, 1371 (E.D.Va.1981) ("Plaintiff objects to the sexual composition of the classroom. Neither the federal nor the state statutes mandate the sexual composi-

tion of a class.") Thus, the local hearing officer's finding about the number of girls in Mairin's LSW class is immaterial.

The local hearing officer's statements about Mairin's academic functioning, relative to the students to Nottingham, are similarly unsupported. According to the uncontroverted evidence, students in Mairin's LSW class range in ages from 10–13, just as the students in the Nottingham class do. The full-scale I.Q. scores of the Nottingham students range from the 70's to 116, which is comparable to the 78 to 110 I.Q. range in Mairin's LSW class. The students in the Nottingham class, like those in the LSW class, encompass a spectrum of educational levels. In reading, ranges in the Nottingham class run from first to fifth grade, while at LSW they run from 1.8 to 3.4; in mathematics, grade levels run from second to fifth grade, while at LSW they run from first to 4.8. Again, it is uncontroverted that Mairin would not be alone as the lowest-level student in the class at Nottingham. Finally, the unrebutted testimony was that Ms. Albright, teacher of exactly the Nottingham class proposed for Mairin, has successfully taught students with lower academic levels than Mairin.

Rather, it is in the LSW class where she is at the very bottom. According to former LSW administrator Dr. Jeannie Johns, her skills even in her LSW school class would be at rock bottom for those students. This evidence cannot support the local hearing officer's findings of peer group needs.

The hearing officer found that Mairin requires an abnormally high degree of one-to-one instruction and integration of related services in her daily schedule. She receives such a program at Lab. Nottingham, on the other hand, is plainly not set up to provide this level of service.

It is unclear what the local hearing officer had in mind in finding that Mairin's need for one-to-one instruction was "abnormally high." What is clear is that almost all her time at LSW is spent in situations which are not one-to-one.

While she was at LSW, Mairin participated in a variety of classes, none of which was a one-to-one tutorial. Instead, most had student-teacher ratios of from 6:1 to 8:1. LSW's own witness conceded that Mairin has made progress in classes even with an 8:1 ratio. In the area of reading, LSW academic director Karen Duncan likewise stated that Mairin had made progress even with a 4:1 ratio. Laura Solomon testified that most classes were a 7:1 or 6:1 ratio except reading which was 1:1. According to the parents' own witnesses, in the area where Mairin gets the greatest amount of one-to-one instruction, she has made the least amount of progress.

In any case, the local hearing officer ignored the undisputed fact that the school system's proposed Nottingham program does include one-to-one instruction for Mairin, in both reading and mathematics. Indeed, the school system added this type of one-to-one instruction specifically to accommodate the parents. One-to-one instruction is written into the school system's proposed IEP. It is further undisputed that at Nottingham, Mairin can get up to 25 minutes of one-to-one instruction per day. This is only five minutes less than she received at LSW.

The hearing officer's casual statement that Nottingham is "not set up to provide" one-to-one instruction, is without foundation.

The evidence is uncontroverted that at Nottingham, therapy services are available, and are integrated into the school system's program. Dr. Lang explained that the speech and language pathologist is available to classroom teachers to consult as needed. The school system also specifically utilizes Wednesday afternoon planning time for consultation and meetings between therapists and teachers. In addition, there are regular student study committee meetings, where a group of professionals at the school discusses strategies for particular students.

The uncontradicted evidence demonstrates that the school system in fact com-

prehensively integrates its related services, including speech/language and occupational therapy, into the Nottingham program.

The local hearing officer found that Mairin receives daily reinforcement in her areas of reactive strengths at Lab—e.g., social studies, science, humanities, etc. Nottingham simply is not equipped to provide such classes on a regular basis.

The evidence indicates the opposite. Science, social studies and humanities are an integral part of the proposed program at Nottingham. The IEPs include goals for, American History, Life Science, Earth Science, and Health Science. Further, school system Learning Disabilities teachers Christine Williams and Charlotte Albright both explained in their administrative hearing testimony that their schedule includes science and social studies. The local hearing officer's suggestion that Nottingham is "not equipped to provide such classes" cannot be taken seriously.

Witnesses for the school system testified how they use a "hands-on approach" to learning in every academic area at Nottingham. The local hearing officer found the Lab school emphasizes a nontraditional approach to learning such as their academic club program, which minimizes a child's need to read or write when reading and writing are so difficult. Although Nottingham is not a traditional school in the Arlington system, it is clear from the testimony at the hearing that the students who attend can appropriately handle that approach, whereas Mairin cannot.

The local hearing officer did not suggest what he meant by "that approach," nor what testimony he relied upon. He made no attempt to explain away the extensive and undisputed testimony of school system Learning Disabilities teachers Charlotte Albright and Christine Williams. These teachers described how they actually teach science, social studies, and other subjects in their special education classes. At trial, Ms. Albright expanded upon the type of "learn-by-doing" approach which she uses to make education exciting for her Learning Disabled students.

The school system's Nottingham program also uses many other approaches, including taped "talking books", computers, peer tutoring, and incorporating art into the curriculum. In sum, the school system's Nottingham program actually uses an innovative, nontraditional, and hands-on approach which can only be described as far superior to LSW.

The local hearing officer's observations about LSW's "nontraditional approach" are in reality nothing more than a perceived difference over educational methodology. The Fourth Circuit has made clear that Courts (and hearing officers) are not entitled to second-guess a school system's decisions as to educational methodology. *Barnett v. Fairfax County School Board,* 927 F.2d 146 (4th Cir.1991). The Court there quoted with approval this Court's statement that "[W]hile a school system must offer a program which provides educational benefits, the choice of the particular educational methodology employed is left to the school system." 927 F.2d at 151.

The local hearing officer was unduly swayed by the labels which LSW gave its courses, and thus did not address the substance of the school system's program. In this regard, a case from the D.C. Circuit, *Leonard v. McKenzie,* 869 F.2d 1558, 1562 (D.C.Cir.1989), is on point. In *Leonard,* as here, parents sought public finding for LSW, on the basis that the public school's offered program did not include LSW offerings such as "academic club." The Court rejected this argument, observing, "the fact that Prospect [the public school program] offers 'social studies' instead of 'academic club' does not render Prospect incapable of implementing Brandon's IEP, especially in light of Prospect's emphasis on experiential methods of teaching." 869 F.2d at 1562.

Likewise, here, the school system offers the same course content, simply as "social studies" rather than "academic club," and teaches that content using the same hands-

on approach. Thus, as in *Leonard,* the local hearing officer's elevation of LSW's form over the school system's substance must be rejected.

The local hearing officer found that Mairin has repeatedly demonstrated that she requires all of her services to be delivered as part of a total, self-contained structure if she is to benefit from any of them. It is clear that Mairin's level of frustration and dysfunction that she has exhibited in the past would render it impossible for her to receive benefit at Nottingham.

The testimony does not support such a view. The local hearing officer's opinion gives no clue as to the basis for such a sweeping statement. This is all the more important given that the material differences between LSW class and the Nottingham class are so small.

Certainly, the local hearing officer's statement that Mairin needs "a total, self-contained structure" cannot be a reason for rejecting the school system's program, since it is undisputed that the Nottingham class is itself a "self-contained" class, into which therapy services are integrated.

Even the parents' professional witnesses could not support the local hearing officer's contention that it would be "impossible" for Mairin to receive benefit at Nottingham. Dr. Jeannie Johns admitted on cross-examination that Nottingham was an excellent school and that Mairin would make gains in the program. Neither the parents nor their witnesses could dispute that the school system's proposed IEP was an appropriate one. Laura Solomon conceded that it was a fine IEP. Thus by the admissions of the parents' own witnesses, the Nottingham program would in fact provide educational benefit to Mairin.

The legal standard which the school system must meet is to provide a program in which the student would receive "some educational benefit." *Rowley,* 458 U.S. at 203, 102 S.Ct. at 3049. Here, the parents and their witnesses have admitted that the school system's Nottingham program would, in fact, provide educational benefit for Mairin.

Nor can there by any dispute that the Nottingham program is a much less restrictive and more normalized placement for Mairin than is LSW. Though Nottingham would provide an intensive, self-contained class for all academics (just as Mairin had at LSW), at Nottingham Mairin could also participate in lunch, recess, assemblies, physical education, and other miscellaneous nonacademic activities with non-handicapped students. At LSW, of course, Mairin could have no contact with non-handicapped students at all.

Even where a child needs academic instruction in a special education setting (as Mairin does) the law provides that:

In providing or arranging for the provision of nonacademic and extracurricular services and activities, including meals, recess periods ... each public agency shall ensure that each handicapped child participates with the non-handicapped children in those services and activities to the maximum extent appropriate to the needs of that child.

34 C.F.R. § 300.553. As the Official Comment to that section indicates "this requirement is especially important for children whose educational needs necessitate their being with other handicapped children for most of the day."

The local hearing officer described the EHA's mainstreaming provisions as a "general goal." He failed to appreciate that they are instead a mandatory requirement, as the Fourth Circuit has underscored:

Mainstreaming of handicapped children into regular school programs where they might have opportunities to study and to socialize with non-handicapped children is not only a laudable goal but is also a requirement of the Act.

*DeVries v. Fairfax County School Board,* 882 F.2d 876, 878 (4th Cir.1989). The local hearing officer misunderstood the mandatory nature of the least restrictive environment provisions, and ignored parents' ad-

mission that Mairin could benefit from the Nottingham program, including contact with non-handicapped children in nonacademic activities. His findings to the contrary must be rejected.

The local hearing officer also made several procedural findings in his opinion. The parents concede, as they must, that only serious procedural violations could be grounds for finding that the school system had by that alone denied a free appropriate public education to Mairin. *See, Board of Education v. Dienelt,* 843 F.2d 813 (4th Cir.1988); *Hall v. Vance,* 774 F.2d 629 (4th Cir.1985); *Spielberg v. Henrico County Public Schools,* 853 F.2d 256 (4th Cir.1988). The Fourth Circuit and other courts have equally recognized that mere technical violations of EHA procedures, which do not deny meaningful parental participation, do not render a school system's proposed program inappropriate. *Burke County Board of Education v. Denton,* 895 F.2d 973, 982 (4th Cir.1990); *Scituate School Committee v. Robert B.,* 620 F.Supp. 1224, 1228–30 (D.R.I.1985), *affirmed* 795 F.2d 77 (1st Cir. 1986). Any other rule would exalt form over substance.

■ The local hearing officer identified two alleged procedural violations by the school system. First, he found that the school system made no effort to comply with federal and state requirements for notice. Admittedly, APS never proposed the Nottingham placement in writing, as required by 34 C.F.R. Section 300.505.

The local hearing officer's statement in this regard demonstrates a complete inattention to the record.

The placement proposed for Mairin, "Nottingham," in a "self-contained" classroom, appears on the very face of the school system's proposed IEPs, both for 1988–89 and for 1989–90. Page two of each IEP explains why the school system considered Nottingham to be the least restrictive appropriate placement. A private day program is listed as one of the considerations in the continuum options, but was considered too restrictive.

The parents had extensive actual notice of all the things required by that section of the regulations. Mairin's mother testified at trial that she clearly knew the placement was Nottingham at the time. The parents here have participated fully in the assessment, eligibility, and IEP process, and have been advised by counsel throughout. There can therefore be no violation of the EHA.

Indeed, the same type of "lack of notice" argument embraced by the local hearing officer was condemned by another District Court in *Brookline School Committee v. Golden,* 628 F.Supp. 113, 115 n. 1 (D.Mass. 1986). The Court there noted that "the fact of actual knowledge casts a shadow over the parents' motives for pressing the issue of Brookline's compliance with the statutory notice requirements at the Bureau hearing." Likewise here, the alleged lack of further written notice to the parents of the Nottingham placement proposal is practically and legally irrelevant.

The local hearing officer's opinion addresses the IEP for only one of the two years involved in this case, 1988–89. He stated that from the record, it is evident that shortly after the opening of the second meeting for consideration of the IEP issue, the APS disclosed that it was their intention to place Mairin in a special education class at Nottingham.

This led the local hearing officer to conclude that "it is clear from *Spielberg v. Henrico County Public Schools,* 853 F.2d 256 (4th Cir.1988), that a school system violates the very purpose of the IEP requirement if it determines placement before completion of the IEP." In fact, however, the school system fully involved the parents in the IEP process, and did not violate any of the EHA's procedural requirements.

In June 1988, the parents (through their attorney) first requested that the school system fund Mairin's placement at LSW. Once the required evaluation data had been received, an eligibility committee was convened. That committee determined that

Mairin was eligible for special education as a "Learning Disabled" student. In its recommendations, the committee also suggested that a "self-contained" class (i.e., a small, structured class) be considered for Mairin.

Neither of these findings was at all surprising. Both the school system and LSW had first identified Mairin as "Learning Disabled" in 1984. And since at LSW, Mairin had attended a Learning Disabilities "self-contained" class for her entire four years there.

The parents and school system staff assembled for an IEP meeting on December 8, 1988. Mr. Eig, counsel for the parents, also appeared at the meeting, while the school system did not bring a lawyer. At the meeting, the school system offered a draft IEP as a starting point for discussion. During the lengthy meeting, the parents and the school system agreed upon a description of Mairin's current level of educational functioning, her educational goals, her many short-term objectives, and the type of related therapy services to be provided. At the end of the meeting, the parents and their lawyer asked school system staff where the IEP could be implemented.

Unknown to the school system, the parents had decided even before the first IEP meeting began that they would reject whatever proposal the school system made. Both Mr. and Mrs. Doyle testified they had told Mairin she would stay at LSW regardless of what IEP placement the school system proposed.

In order to respond to the request of the parents and their counsel, Dr. Lynn Lang of the school system checked the enrollments of self-contained classes for Learning Disabled students. She discovered that the self-contained class for Learning Disabled students at Taylor Elementary (the school nearest Mairin's home) was fully enrolled, but that the self-contained class for Learning Disabled students at Nottingham Elementary (the next-nearest school,

about two miles from her home) was not fully enrolled.

When the IEP team reconvened the next morning, Dr. Lang conveyed the enrollment information to the parents. The parents and the school system thereafter proceeded to resolve the few additional details which had not been completed. These included the precise amount of one-to-one instruction for reading and math, and the scheduling for therapy services. The IEP meeting culminated with the school system offering placement for Mairin in a self-contained special education class for Learning Disabled students at Nottingham Elementary.

Not surprisingly, the parents rejected the school system's offer of placement and continued to send Mairin to LSW.

One year later, while this action was pending in the district court, the parties scheduled a meeting to develop an updated IEP for Mairin for the balance of the 1989–90 school year.

In preparing for that January 1990, IEP meeting, the school system gathered considerable new information about Mairin. School system staff then spent time working on a new draft IEP for the full committee to consider. In the course of this preparation, school system staff also gave thought to possibilities and options available for Mairin's placement. In order to prepare for the upcoming meeting, Dr. Lang investigated the current enrollment situation at various Learning Disabilities self-contained classes within the school system.

On January 9, 1990, an IEP meeting took place. The parents were again present, along with several LSW representatives, and a representative of parents' counsel. After reviewing Mairin's strengths and weaknesses, the IEP team discussed in detail the many educational goals and objectives which the school system had drafted for Mairin. There was extensive give-and-take among the IEP team members, and almost every page of the draft IEP was

changed to incorporate the suggestions and requests of the parents.

Through this discussion, the parents and the school system agreed upon Mairin's educational goals and objectives. At the end of the meeting, the school system again offered placement for Mairin in a Learning Disabilities self-contained class at Nottingham, which included occupational therapy, speech therapy, and adapted physical education.

The parents (and, for 1988–89, the local hearing officer) contend that the school system committed a procedural violation by proposing a placement for Mairin before the IEP was completed, in violation of *Spielberg v. Henrico County Public Schools*, 853 F.2d 256 (4th Cir.1988). This argument misreads both the letter and spirit of *Spielberg*, and ignores the facts set forth above.

The EHA's procedural requirements are designed to insure that parents participate meaningfully in the decision-making process for their handicapped child. *Rowley*, 458 U.S. at 205–06, 102 S.Ct. at 3050. Thus, if the school system has already fully made up its mind before the parents ever get involved, it has denied them the opportunity for any meaningful input.

*Spielberg* was a case like that. In *Spielberg*, the school division unilaterally decided to change drastically a student's placement which it had funded for eight years. This decision was made over eight months before the IEP conference with the student's parents. The Fourth Circuit found that the school system's unilateral decision had deprived that student's parents of any opportunity to participate, and held that this action alone invalidated consideration of the school system's proposed program.

■ Thus, *Spielberg* makes clear that school officials must come to the IEP table with an open mind. But this does not mean they should come to the IEP table with a blank mind. Thus, EHA administrative regulations require that the school system include in the IEP meeting an administra-

tor qualified to supervise provisions of special education to the child. 34 C.F.R. § 300.344. The school system must also include in the meeting a teacher "qualified to provide education in the type of program in which the child may be placed." (*Id.*) Moreover, in considering placement options, the IEP team does not write on a completely clean slate. Rather, the law requires that a school system's offer of placement be "as close as possible to the child's home." 34 C.F.R. § 300.552. Finally, the regulations make clear that the school system may come to an IEP meeting with the draft IEP for discussion. 34 C.F.R. part 300, appendix C, Q.55. Thus, while a school system must not finalize its placement decision before an IEP meeting, it can, and should, have given some thought to that placement. That is exactly what the school system did here.

■ There is no dispute that both the parents and their representatives participated extensively in the IEP process for both 1988–89 and 1989–90. As all the testimony indicates, the parents and their representatives participated fully in the process, and the school system staff was receptive and responsive at all stages to any questions and concerns raised.

For the 1988–89 IEP meeting, the IEP goals and objectives were drafted, and the IEP was in all material respects completed, before any specific placements were discussed. Indeed, the school system first raised the possibility of Nottingham in response to a specific inquiry from the parents and their attorney. Far from predetermination, the school system staff merely referenced a possible placement option which they believed to be in the least restrictive environment, given the agreement of the parties to the agreed-upon IEP goals and objectives. All that remained as open items in the meeting were logistical issues, including the duration of one-to-one instruction in reading and math, and the scheduling of occupational and speech therapy sessions—neither of which would be determinative of placement in any event.

Even if mentioning the name "Nottingham" at that point were a technical violation of the EHA, it is not the stuff of which serious procedural violations are made. *See Doe v. Defendant I,* 898 F.2d 1186, 1191 (6th Cir.1990) (even though some required sections of IEP were not present, those "technical deviations" from EHA procedures did not render IEP invalid. "[A]dequate parental involvement, and participation in formulating an IEP, not adherence to the laundry list of items given ..., appear to be the Court's primary concern in requiring that procedures be strictly followed"). Any other rule might encourage parents to bait well-meaning school personnel into answering inquiries, so that a claim for private school funding could be predicted thereon.

For the 1989–90 school year, a specific placement proposal was not made literally until the very end of the meeting. Prior to that, some team members had discussed possible Learning Disabilities self-contained classes, but remained receptive and responsive to further suggestions.

For the reasons stated, the opinion of the local hearing officer should be reversed and judgment entered in favor of the school system.