COURT OF APPEALS OF VIRGINIA


Present:  Judges Elder, Annunziata and Humphreys
Argued at Richmond, Virginia


STEVEN W. WHITE AND JANET A. WHITE,
 PARENTS AND NEXT OF FRIEND OF MICHAEL GLENN WHITE, AND
 MICHAEL GLENN WHITE
                                        OPINION BY
v.   Record No. 1995-00-2          JUDGE ROSEMARIE ANNUNZIATA
                                         JULY 10, 2001
SCHOOL BOARD OF HENRICO COUNTY


          FROM THE CIRCUIT COURT OF HENRICO COUNTY
                  L.A. Harris, Jr., Judge

          Darrel Tillar Mason (Carpenter & Mason,
          P.L.C., on briefs), for appellants.

          Kathleen S. Mehfoud (Reed, Smith, Hazel &
          Thomas, L.L.P., on brief), for appellee.


     This case arises under the Individuals with Disabilities

Education Act ("IDEA"), 20 U.S.C. §§ 1400 et seq., and Virginia

Code §§ 22.1-213 to 22.1-221.  The appellants, Steven W. White

and Janet A. White, parents and next of friend of Michael Glenn

White, and Michael Glenn White ("Glenn") appeal a decision by

the Circuit Court of Henrico County denying a request for

tuition reimbursement by the appellee, the County of Henrico,

for Glenn's education at The New Community School (TNCS), a

private school.

     Appellants contend the trial court erred:  (1) in failing

to accept the findings of the state level review officer as

prima facie correct; (2) in failing to explain its reasons for

rejecting the findings; (3) in failing to find that the procedures used by Henrico in developing and implementing Glenn's IEPs were so flawed as to ipso facto constitute a denial of a free appropriate public education; (4) in finding that the IEPs developed for Glenn provided him with an appropriate education, which offered meaningful educational benefit; and (5) erred in denying the parents' tuition reimbursement request. For the following reasons, we conclude the decision of the circuit court was not plainly wrong and we affirm the judgment.

I.

BACKGROUND

The Individuals with Disabilities Education Act (IDEA), 20 U.S.C. §§ 1400 et seq., provides federal funds to assist state and local agencies in educating disabled children. The IDEA conditions the receipt of such funds upon a state's compliance with certain goals and procedures. The Virginia General Assembly has enacted a number of statutes to ensure compliance with the IDEA requirements. See Code §§ 22.1-213 to 22.1-221. In addition, the Virginia Board of Education has developed regulations for implementing the statutory scheme. See 8 VAC 20-80-10 et seq.

Both the IDEA and the Virginia Code require schools to make available to disabled children "a free appropriate education." 20 U.S.C. § 1412(a)(1)(A); Code §§ 22.1-214(A) and 22.1-215. Local agencies provide an appropriate education to each disabled

child by means of an "individualized educational program (IEP)." 20 U.S.C. § 1414(d); 8 VAC 20-80-10, 20-80-62.  The IEP is a written document developed after a meeting attended by the disabled child's parents, his or her teacher, and local school division representatives.  20 U.S.C. § 1414(d); 8 VAC 20-80-62. The IEP contains, inter alia, a description of the specific educational services to be provided the child, annual goals, and objective criteria for evaluating progress.  20 U.S.C. § 1414(d); 8 VAC 20-80-62.  The IDEA favors mainstreaming children by requiring that disabled children be taught with non-disabled children, to the maximum extent possible, and by requiring that the disabled child be placed in the least restrictive environment, consistent with the child's needs.  20 U.S.C. §§ 1412(a)(5)(A) and 1414(d)(A); 8 VAC 20-80-64.  The local agency must review each child's IEP at least annually.  20 U.S.C. §§ 1414(d)(4)(A)(i); 8 VAC 20-80-62.

The local agency is required to include the parents in the development of the child's IEP.  20 U.S.C. § 1414(f); 8 VAC 20-80-62(C).  Parents have the right to an impartial due process hearing through which to bring complaints regarding proposed services and must be given a right to appeal to the state educational agency.  20 U.S.C. § 1415; 8 VAC 20-80-70. Furthermore, "[a]ny party aggrieved by the findings and decision" at the state administrative hearing has "the right to bring a civil action with respect to the complaint . . . in any

State court of competent jurisdiction or in a district court of the United States without regard to the amount in controversy." 20 U.S.C. § 1415(i)(2); see also Code § 22.1-214(D) (giving parties the right to "bring a civil action in the circuit court for the jurisdiction in which the school division is located."); 8 VAC 20-80-76(O)(1).  When the public school cannot provide a disabled child with an appropriate education, the school must "pay to, or on behalf of, the parent or guardian of such child the reasonable tuition cost" of an appropriate private education.  20 U.S.C. § 1412(a)(10)(C)(ii); Code § 22.1-218(A).

Glenn is learning disabled in the areas of reading, written language and spelling.  Glenn attended Henrico County Public Schools ("Henrico") through fifth grade and was provided with special education services for the duration of his enrollment there, beginning in preschool.  While Glenn was a student in Henrico, his parents ("the Whites") each year participated in and gave permission for the implementation of an IEP, which delineated the special education services that Glenn was to receive.

Glenn's 1995-96 IEP, the IEP for his fifth grade year at Tuckahoe Elementary School, provided him with special education services for two hours per day and speech services for one-half hour per week.  Because Glenn's disability did not prevent him from participating in some grade-level activities and he was able to benefit from the instruction given in grade-level

subjects, with accommodations made for his reading disability, the remainder of his day was spent in regular education classes. The Whites agreed to this IEP on June 5, 1995.

From September until October 2, 1995, Henrico used a collaborative teaching method to deliver Glenn's special education services, consisting of two hours of special education services each day, as specified by his 1995-96 IEP. The collaborative teaching approach allowed Glenn to receive his IEP services in a regular class, co-taught by a regular education teacher and a special education teacher.

On October 2, 1995, shortly after school began in September 1995, Henrico reverted to employing the "pull-out" teaching method to provide special education services to Glenn. The "pull-out" method entailed removing Glenn from his regular classes and teaching him in a special education setting for disabled students only. Services were provided in a "pull-out" model form for two hours daily and in a collaborative model form for thirty minutes daily for the remainder of the school year. In February 1996, Glenn's IEP was amended to include an additional one-half hour per day of special education services. The increase in services was designed to prepare him for middle school and to improve his skills. At the beginning of Glenn's fifth grade year, his reading level was at the beginning of second grade level. At the end of his fifth grade year, Glenn's

reading level was at the end of second grade/beginning of third grade.

Glenn was scheduled to attend Tuckahoe Middle School as a sixth grade student during the 1996-97 school year. In the spring of 1996, the Whites informed Henrico that Glenn would be attending TNCS for the 1996-97 school year. On June 6, 1996, Henrico held a meeting to develop Glenn's IEP for the 1996-97 school year. Glenn's mother was unable to attend the meeting but gave Henrico permission to hold the meeting in her absence. On June 10, 1996, after reviewing the content of the proposed IEP with Cecelia Batalo, Glenn's fifth grade special education teacher, Mrs. White signed and gave permission for the implementation of the IEP developed by Henrico.

The proposed IEP for the 1996-97 school year provided Glenn with one period of instruction in each of the following areas in the special education program: English, reading, math and science. The IEP also offered Glenn the opportunity to interact with regular education students in those classes in which he did not require special education assistance, including his elective and physical education classes and his lunch period. The IEP classified Glenn as "self-contained" because he was scheduled to spend more than one-half his school day supported by special education services. The IEP provided for extensive modifications in Glenn's regular education classes, which included untimed tests, small group instruction, oral

administration of tests, and acceptance of short answers rather than lengthy responses to test questions.

Despite giving their permission to implement the IEP proposed by Henrico, the Whites unilaterally removed Glenn from Henrico in September 1996 and placed him in TNCS, a private school that serves only disabled students. On May 30, 1997, the Whites initiated a due process hearing seeking reimbursement for the cost of Glenn's private special education at TNCS. Upon receipt of the hearing request, Henrico initiated a full evaluation of Glenn, which consisted of a psychological evaluation and a social history.

Although the Whites communicated their intent to keep Glenn at TNCS for the 1997-98 school year, Henrico held a meeting on September 18, 1997, to develop an IEP for the 1997-98 school year. The Whites participated in the 1997-98 IEP development meeting, but they did not sign the IEP giving permission for its implementation. Numerous professionals from Tuckahoe Middle School participated in the development of the 1997-98 IEP, including Cecilia Batalo, Glenn's fifth grade special education teacher, John Markey, a psychologist who had recently evaluated Glenn, Judy McCallum, a Henrico special education teacher with twenty years experience, and Jan Parrish, who had conducted a social evaluation of Glenn just prior to the meeting. Although no one from TNCS attended the meeting, the IEP committee had available to it information from TNCS, including the IEP

developed by TNCS for the 1996-97 school year, Glenn's progress

reports from TNCS and information that the Whites presented

regarding Glenn's progress at TNCS.  The Henrico IEP committee

also had access to the results of the re-evaluation conducted by

Henrico immediately prior to the IEP meeting, which indicated

Glenn had not made educational progress while being educated at

TNCS and had, in fact, regressed in the areas of reading,

written language and math during his year at TNCS.[1]

The local hearing officer at the first tier of the

administrative proceedings heard testimony from twelve witnesses

over three days in the fall of 1997.  The local hearing officer

concluded, on April 15, 1998, that Henrico had made a free

appropriate public education available to Glenn under the IDEA

and denied the Whites' reimbursement request.  In making that

decision, the local hearing officer "particularly and

significantly [gave] considerable weight to both the quantity

and quality of the evidence through the testimony of [eight

Henrico witnesses]."  He went on to state that, "beyond any

required burden of proof the County's evidence demonstrates

clearly and convincingly that the County has met and is able to

meet all of the requirements of the special education offering

---

[1] Glenn's standardized test scores in the area of reading regressed from a standard score of 70 in 1996 to a standard score of 60 at the end of his first year at TNCS.  His scores in math regressed from a standard score of 95 to a standard score of 79 at TNCS.  The written language score decreased from 61 while in Henrico to 41 after a year of educational services at TNCS.

of service to this STUDENT."  In denying the Whites' tuition reimbursement, the local hearing officer stated, "[m]y reasons described above and now in summary are that Henrico has and by its IEP's proposed to provide the STUDENT with a free appropriate public education."  The hearing officer also determined that the failure of Henrico to include a teacher from the private school at the IEP meeting in September 1997, while a violation of state regulations, did not invalidate the IEP because the committee had information from TNCS available for its consideration.

The Whites appealed the decision of the local hearing officer to a state level review officer on May 12, 1998.  The state level review officer heard only limited additional evidence.  He reversed the local hearing officer's decision, finding the alleged procedural violations invalidated the proposed IEPs for Glenn's sixth and seventh grade years and that the education offered by Henrico was inappropriate.  The state level review officer awarded the Whites tuition reimbursement for the 1996-97 and 1997-98 school years, as well as prospective relief.

On August 11, 1998, Henrico filed a civil action in the Circuit Court of Henrico County, pursuant to Code § 22.1-214(D).  The trial court ruled in favor of Henrico on July 21, 2000, finding Henrico had made available to Glenn a free appropriate public education in accordance with the IDEA and that the

procedures used by Henrico did not prevent Glenn "from receiving appropriate educational benefits."  Accordingly, the circuit court denied the Whites' request for tuition reimbursement.  The Whites appealed the circuit court decision to this Court on August 16, 2000.  For the reasons that follow, we affirm.

II.

ANALYSIS

A.

Standard of Review

The Whites contend the circuit court failed to apply the applicable standard of review because it did not find the state level review officer's factual findings to be prima facie correct, and failed to explicitly state in writing its reasons for reversing the state level review officer's decision.  We disagree with the Whites' claim of error.

In support of their argument, the Whites cite several federal court cases from the Fourth Circuit which state that the opinion of a state level review officer is to be considered prima facie correct and that the district court is required to explain, in writing, why it does not adopt those findings. Federal case law regarding the standard of review to be applied by federal district courts is not binding on this Court.  The Virginia Supreme Court has established the appropriate standard of review to be applied in IDEA cases appealed to the circuit

court in School Bd. of Campbell County v. Beasley, 238 Va. 44,
380 S.E.2d 884 (1989):

> Review of an administrative decision by
> officers appointed under authority of the
> Board of Education concerning a special
> education program for a handicapped child is
> not subject to the Administrative Process
> Act (APA), but to the provisions of
> § 22.1-214(D). . . . [T]he statute permits
> the court to hear additional evidence, to
> weigh the evidence as a whole, and to base
> its decision on a preponderance of the
> evidence. The trial court is not limited in
> determining, as under the APA, whether there
> is "substantial evidence in the agency
> record" to support the administrative
> findings of fact.
>
> *    *    *    *    *    *    *
>
> Therefore, the proper standard to be
> employed by the circuit court is "to
> determine, based on a preponderance of the
> evidence, whether the substance of the
> proposed individualized educational program
> is reasonably calculated to enable the child
> to receive educational benefits."

Id. at 50, 380 S.E.2d at 888 (citations omitted).

The Supreme Court further held that, although "[d]ue weight
must be given by the trial court to the administrative
proceedings," id. at 51, 380 S.E.2d at 888, the trial court is
charged with making "an 'independent decision' based on the
preponderance of the evidence." Id. at 50, 380 S.E.2d at 888
(citation omitted); see also Hendrick Hudson Dist. Bd. of Ed. v.
Rowley, 458 U.S. 176, 205 (1982); Code § 22.1-214(D).

Further, under Virginia law, the circuit court is not
required to state in writing its reasons for rejecting the

findings of fact made by the state level review officer. Therefore, the circuit court in this case was not required to find the state level review officer's findings to be prima facie correct nor did it have to state, in writing, its reasons for not adopting the factual findings made by the state level officer.

Additionally, the standard of review that governs an appeal to this Court requires that we view the evidence in the light most favorable to Henrico, the party prevailing below. Beasley, 238 Va. at 51, 380 S.E.2d at 889. We will not set aside the circuit court's decision "unless it appears from the evidence that such judgment is plainly wrong or without evidence to support it." Id. (citations omitted). We are "not permitted to reweigh the evidence or to substitute [our] judgment for that of the circuit court." Id.

B.

Free, Appropriate Education

The United States Supreme Court, in Rowley, 458 U.S. 176, established a two-part test for determining whether a school has complied with the requirements of the IDEA in providing a student with a free appropriate education: (1) whether the school complied with the procedural requirements of the Act; and (2) whether the IEP developed by the school was reasonably calculated to enable the child to receive educational benefits. Id. at 206-07.

The Whites contend that Henrico not only failed to comply with the procedural requirements of the IDEA but also that the IEP developed by Henrico was not reasonably calculated to enable Glenn to receive educational benefits.

1.  Procedural Violations

The Whites contend Henrico committed several procedural violations in conjunction with its development of the IEP and that these violations effectively deprived Glenn of a free appropriate education.  While we acknowledge that procedural violations, alone, may constitute a failure to provide an appropriate education under certain circumstances, Rowley, at 206-07, each case must be reviewed in the context of the particular facts presented.  An IEP will not be set aside absent "some rational basis to believe that procedural inadequacies compromised the pupil's right to an appropriate education, seriously hampered the parents' opportunity to participate in the formulation process, or caused a deprivation of educational benefits."  Roland M. v. Concord Sch. Comm., 910 F.2d 983, 994 (1st Cir. 1990) (finding procedural violations insufficient to render the IEP inadequate); see also Burke County Bd. of Educ. v. Denton, 895 F.2d 973, 982 (4th Cir. 1990) (finding the Board's procedural violation did not deprive the child of educational benefits or opportunity); cf. Hall v. Vance County Bd. of Educ., 774 F.2d 629, 635 (4th Cir. 1985) (court found

consistent failure to comply with IDEA requirements constituted failure to provide child with free appropriate education).

We find that because any procedural inadequacies in this case did not hamper the Whites' opportunity to participate in the development of Glenn's IEP and did not result in a loss of an educational opportunity or benefit for Glenn, the violations did not invalidate the IEP. We will address each alleged violation.

a. For a period of one month at the beginning of Glenn's fifth grade year, Henrico provided special education services to Glenn through a collaborative, rather than a "pull-out" teaching method. The Whites contend that changing the teaching method without amending the IEP constitutes a procedural violation that invalidates the IEP. Henrico counters that because the IEP did not specify the method of services, it was not required to amend the IEP.

Parents must be given written notice prior to a change in "the identification, evaluation, or educational placement of the child." 20 U.S.C. § 1415(b)(3); 8 VAC 20-80-70(C). Glenn's 1995-96 IEP did not specify a particular method for implementing his special education services but, rather, provided that he would receive two hours of special education services per day. Substituting the "pull-out" teaching method for the collaborative method did not constitute a change in the services he was receiving, nor did it involve a change in his

identification, evaluation or placement.  See, e.g., Erickson v. Albuquerque Public Schools, 199 F.3d 1116, 1120, 1122 (10th Cir. 1999) (finding that a change in the type of occupational therapy provided the child "was merely a change in methodology of services, not a change in educational placement" or "delivery of services"); see also Rowley, 458 U.S. at 207 ("questions of methodology" are left to the states); Barnett v. Fairfax County School Board, 927 F.2d 146, 152 (4th Cir. 1991) (selection of educational policy and method is within authority of state and local officials).  Therefore, Henrico did not commit a procedural violation by failing to inform the Whites of the change or in not amending Glenn's IEP.

Furthermore, the Whites limited their request for tuition reimbursement to Glenn's sixth and seventh grade years and did not request tuition reimbursement for his fifth grade year.  The Whites cite no legal basis for or any authority in support of their contention that an IEP for a given year may be invalidated because of procedural violations occurring in a prior year, nor could we find any.

b.   Although Glenn's mother gave permission for Henrico to conduct the IEP development meeting for Glenn's sixth grade IEP in her absence and later reviewed and signed the IEP, the Whites contend that her absence at that meeting constitutes a procedural violation that invalidates the IEP.

The IDEA requires that parents be offered the opportunity to participate in IEP development meetings. 20 U.S.C. § 1414(f); 8 VAC-20-80-62(D). Henrico informed Mrs. White of the scheduled meeting and received her permission to proceed in her absence. In addition, after the meeting, Cecilia Batalo, Glenn's fifth grade special education teacher, reviewed the proposed IEP with Mrs. White, who signed the IEP, giving her consent for its implementation. Although the parents had informed Henrico they were enrolling Glenn in TNCS for the 1996-97 school year, the parents did not subsequently voice any complaints or objections to Henrico regarding the services proposed in the June 1996 IEP. Likewise, the Whites did not ask Henrico to make any changes to the proposed program.

We find the record supports a finding that Henrico provided Mrs. White with the requisite opportunity to participate in the development of the IEP. Any failure to participate is attributable to the Whites' decision not to do so and does not constitute a procedural violation by Henrico. In addition, Mrs. White's signature on the form evidences her consent to the IEP, and any objection to its implementation one year later was untimely. See Warren G. v. Cumberland County Sch. Dist., 190 F.3d 80, 84 (3rd Cir. 1999) (parents cannot recover "tuition reimbursement for the period preceding the parents' request for a due process hearing"); Bernardsville Bd. of Educ. v. J.H., 42 F.3d 149, 158 (3rd Cir. 1994) ("[M]ere notice of parental

'dissatisfaction' does not alone put the Board on reasonable notice. . . . [T]he right of review contains a corresponding parental duty to unequivocally place in issue the appropriateness of an IEP.").

c.   Henrico did not develop an IEP for Glenn's seventh grade year until two weeks after the school year at Henrico had begun. The Whites contend that this procedural violation invalidates the IEP.

The IDEA requires the school to have an IEP in effect at the beginning of each school year and that the IEP committee meet at least once a year to review the IEP and, where appropriate, revise its provisions.  20 U.S.C. §§ 1414(d)(2)(A), (d)(4)(A)(i); 8 VAC 20-80-62(B)(1), (B)(6).  Because Henrico last reviewed Glenn's IEP in June 1996, its failure to review his IEP prior to the beginning of the 1997-98 school year constitutes a procedural violation of the IDEA.  However, we find the violation did not deprive Glenn of access to a free appropriate education and, therefore, did not invalidate the IEP.  At the time the IEP was developed, the Whites had already initiated a hearing seeking tuition reimbursement for the year in question and had informed Henrico that Glenn would be returning to TNCS for that school year.  Therefore, the development of the IEP two weeks after the start of Henrico's school year was not material to the Whites' decision to keep Glenn at TNCS and did not result in the loss of an educational

opportunity or benefit for Glenn.  See Sanger v. Montgomery County Bd. of Educ., 916 F. Supp. 518, 526 (D. Md. 1996) (in considering the same procedural violation under circumstances similar to this case, the court found "the [parents] never pressed for a new IEP . . . .  More significantly, the [parents] were wedded to funding at [the private school] and nothing else. It thus would not have mattered in the least when [the public school] was written into the IEP because from the outset the [parents] made it clear that they would not accept it.").

d.   Henrico did not invite a representative from TNCS to the seventh grade IEP development meeting and no one from TNCS attended.  The Whites contend that this procedural violation invalidates the IEP.

The Virginia Regulations require that when a child is attending a private school, a representative from that school must be included in the IEP development meeting.  8 VAC 20-80-66.  We reject Henrico's contention that the Virginia Regulation in effect in 1997, 8 VAC 20-80-60(B)(8)(b), did not require the attendance of a representative from TNCS.  Henrico argues that the headings used in the regulation indicate that the presence of a private school teacher at an IEP meeting is required only when the school places the child in a private school, but not when the parents place the child in a private

educational setting.[2]  However, the headings used in a regulation

do not dictate the meaning of the regulation's provisions.

Jones v. Division of Child Support Enforcement, 19 Va. App. 184,

188-89, 450 S.E.2d 172, 175 (1994).  Rather, we must construe

the body of the statute, which, in this case, clearly states,

"[w]here a child is presently receiving the services of a

private school" a representative from the private school is

required to attend the IEP meetings.

We agree with the Whites that the failure to invite a

teacher from TNCS to the September 1997 IEP meeting constituted

a violation of 8 VAC 20-80-66.  However, notwithstanding the

requirement that a teacher from the private school attend the

IEP meeting, we find, in this instance, the procedural violation

is insufficient to invalidate the IEP.  Although Henrico did not

invite a representative from TNCS to attend the meeting, the

committee had available to it information concerning Glenn's

year at TNCS in the form of documents from TNCS and had the

benefit of the Whites' observations of Glenn during his year at

TNCS.  In addition, Glenn's special education teacher from the

---

[2] The heading for the subsection requiring the attendance of
the private school teacher at the IEP development meeting is
entitled, "Private School Placement," and begins with the
sentence, "Before an LEA (local educational agency) places a
child with a disability in, or refers a child to, a private
school or facility . . . ."  The next subsection is entitled
"Children with disabilities in private schools not placed or
referred by public agencies."  That section, however, does not
address the procedures for developing an IEP for such children.

previous year and two individuals that had recently completed Glenn's psychological and social evaluations participated in the September 1997 meeting. The individuals present at the meeting knew Glenn, had recently worked with him, and had direct knowledge of his needs.

Furthermore, Julia Greenwood, the director of TCNS, testified at the state level review hearing regarding the information she would have provided at the September 1997 IEP meeting had she been invited. The program she described as being appropriate for Glenn was, with a few minor exceptions, identical to the program proposed by Henrico.[3] Her testimony established that the very program elements she believed should have been included in the IEP developed by Henrico in her absence, were, in fact, included in Henrico's IEP.

We conclude that, because the committee had before it sufficient current information to develop an appropriate IEP for Glenn and that it reflected the program elements which the private school believed were necessary to provide Glenn with appropriate educational services, any procedural error in not including a representative from TNCS did not result in a loss of

---

[3] Greenwood testified that Glenn needed one-on-one assistance in reading, a multi-sensory approach to reading, and grade level instruction in small classes, taught by teachers who understood the extent of his disability. Greenwood also testified that accommodations should be made for Glenn, such as allowing oral testing or untimed tests. The IEP developed by Henrico contained all of these elements.

educational opportunity or benefit for Glenn and, therefore, does not invalidate the IEP developed by Henrico. See Roland M. v. Concord Sch. Comm., 910 F.2d 983, 994 (1st Cir. 1990).

e.   The Whites also allege that Henrico pre-determined Glenn's placement prior to the sixth and seventh grade IEP development meetings by drafting a proposed IEP before the meeting. There is no evidence in the record to support this contention.

The IDEA requires that placement decisions be based on the IEP. 34 C.F.R. § 300.552; 8 VAC 20-80-60(B)(7)(a)(2). Deciding to place a child in a particular school before developing an IEP "violates the spirit and intent" of the IDEA. Spielberg v. Henrico County Public Schools, 853 F.2d 256, 259 (4th Cir. 1988). However, the fact that an Henrico representative brought a draft of a proposed IEP to each of the meetings does not conclusively establish that Henrico impermissibly determined Glenn's placement prior to the IEP meeting. The IDEA permits a school board to bring a draft IEP to meetings for the purposes of discussion. See Doyle v. Arlington County Sch. Bd., 806 F. Supp. 1253, 1262 (E.D. Va. 1992), aff'd 39 F.3d 1176 (1994) ("[W]hile a school system must not finalize its placement decision before an IEP meeting, it can, and should, have given some thought to that placement."). The draft IEP provided a starting point for the discussion and nothing more. The Henrico representatives who participated in the IEP development meetings testified that they considered all placement options available

to Glenn, that they were open to suggestions from the Whites regarding the appropriate placement for Glenn, and that the draft IEP could and was modified during the IEP meetings. Furthermore, there is no evidence in the record suggesting that any IEP placement decisions were finalized in advance of the IEP meeting. We find the record supports a finding that the committee did not pre-determine Glenn's placement and that no procedural violation occurred with regard to this issue.

f. Finally, the Whites contend that the IEP developed by Henrico for the 1996-97 school year, Glenn's sixth grade year, did not contain meaningful annual goals, short-term objectives, or criteria for measuring Glenn's progress. Henrico contends this issue is barred under Rule 5A:18. We agree with Henrico that the issue is barred.

The Whites raised the issue for the first time in their motion requesting the circuit court to reconsider its decision to deny the Whites' tuition reimbursement. Because the Whites failed to raise the issue during the administrative proceedings, this issue was not properly before the trial court. See Hampton School District v. Dobrowolski, 976 F.2d 48, 53 (1st Cir. 1992) ("Claims of procedural errors not presented to the administrative hearing officer are not preserved for judicial review by the trial court."); David D. v. Dartmouth School Committee, 775 F.2d 411, 424 (1st Cir. 1985) ("[F]or issues to be preserved for judicial review they must first be presented to

the administrative hearing officer.").  Accordingly, we hold this issue was not properly preserved and is not properly before us.

Because we find that any procedural violations committed in this case did not deprive Glenn of access to an appropriate education, we proceed to the appropriateness of the substance of the program offered by Henrico.

2.  Substantive Provisions of Henrico's IEP

The Whites contend that, because Glenn could not read at grade level, Henrico did not and could not provide him with an appropriate education.  However, the evidence shows Glenn received educational benefits from the Henrico program and that the proposed IEPs offered by Henrico would have continued to provide Glenn with educational benefits, in the least restrictive environment, as required under the IDEA.

Under the IDEA, "a 'free appropriate education' consists of educational instruction specially designed to meet the unique needs of the handicapped child, supported by such services as are necessary to permit the child 'to benefit' from the instruction."  Rowley, 458 U.S. at 188-89.  The education must "be provided at public expense and under public supervision, meet the state's educational standards, approximate the grade levels used in the state's regular education, and comport with the child's IEP."  Id. at 189.  States are not required to "maximize each child's potential 'commensurate with the

opportunity provided other children.'"  Id. at 198.  "[I]f personalized instruction is being provided with sufficient supportive services to permit the child to benefit from the instruction and the other items on the definitional checklist are satisfied, the child is receiving a 'free appropriate public education' as defined by the Act."  Id. at 189; see Beasley, 238 Va. at 50, 380 S.E.2d at 888.  We will not reverse the circuit court's finding that the IEP developed by Henrico was reasonably calculated to provide Glenn with educational benefits unless that finding is plainly wrong or without evidence to support it. Id. at 44, 380 S.E.2d at 884.

Notwithstanding the fact that Glenn failed to progress during his year at TNCS, the Whites contend that TNCS could provide Glenn with a more appropriate education.  Their argument is without merit, however, because the availability of a better private school placement, even if proved, does not establish that a public school program, which is providing a free appropriate education, is an improper placement.  See Hessler v. Maryland State Bd. of Educ., 700 F.2d 134, 139 (4th Cir. 1983). The evidence in this case establishes that Henrico provided Glenn with a free and appropriate education, consistent with the requirements of the IDEA.

The IEP developed by Henrico for Glenn's sixth and seventh grade years provided more extensive services than Glenn had received during his fifth grade year.  The proposed IEP for his

sixth grade year provided that one period of instruction in each of the following areas of the special education program be given:  English, reading, math and science.  Each subject was to be taught by teachers who were certified to teach special education and had expertise in the particular academic subjects they were assigned.  The IEP also provided that Glenn participate in the regular education program for his elective class, for health and physical education and that additional reading time was to be scheduled.  The IEP classified Glenn as "self-contained" because he was to spend more than one-half of his school day supported by special education services.  The IEP provided for extensive modifications in Glenn's regular education classes.  They included:  untimed tests, small group instruction, oral administration of tests, short answers being accepted in place of a lengthy essay, organizational modifications, special equipment and other accommodations.  The IEP prepared for the 1997-98 school year, Glenn's seventh grade year, proposed a similar program.

Unlike the program at TNCS, the IEP proposed by Henrico offered Glenn the opportunity to interact with regular education students.  Under the IDEA, schools are required to place students in the least restrictive environment in which they can receive an appropriate education.  A private program such as TNCS would be required only if Glenn's disability was one in which "a [private] setting is the only educational placement

reasonably calculated to enable [the child] to receive educational benefits."  Martin v. School Bd. of Prince George County, 3 Va. App. 197, 210, 348 S.E.2d 857, 865 (1986).  The evidence fails to establish that TNCS is the only educational setting reasonably calculated to enable Glenn to receive education benefits.

The evidence showed Glenn had made progress during his fifth grade year at Henrico under an IEP that provided less individualized instruction than the program proposed in the sixth and seventh grade IEPs.  In fact, he progressed almost a full grade level in reading in his fifth grade year.  Glenn has a severe learning disability and, although he was not progressing at the same rate as his peers, his progress was real and measurable.

We find, in sum, credible evidence to support the trial court's finding that the IEP proposed by Henrico would have enabled Glenn to benefit educationally and that Henrico complied with the requirement that the state provide Glenn with a "free appropriate public education."  Because we conclude the decision of the trial court is not plainly wrong and that there is ample evidence to support it, we affirm the judgment.  See Beasley, 238 Va. at 51, 380 S.E.2d at 889.

Affirmed.