Sean TRACY, William Tracy, and Rebecca Tracy, Plaintiffs,

v.

BEAUFORT COUNTY BOARD OF ED., Defendant.

No.  C.A.9:03–849–23.

United States District Court, D. South Carolina, Beaufort Division.

March 5, 2004.

---

678

Lee Shuman Bowers, Bowers and Siren, Estill, SC, Mary Kay Siren, Bowers and Siren, Bluffton, SC, for Plaintiffs.

David T. Duff, Duff Dubberly Turner White and Boykin, Columbia, SC, for Defendant.

## *ORDER*

DUFFY, District Judge.

In this action, Plaintiffs challenge the determination of the State Review Officer ("SRO") that Sean Tracy ("Sean") was provided a free appropriate public education ("FAPE") from 1998–2001, as required by Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 *et seq.,* and that they are not entitled to private placement reimbursement. The parties have filed cross-motions for summary judgment.

### A. Overview of the IDEA

The IDEA was designed to provide free appropriate educational services for

"child[ren] with a disability," meaning children:

(i) with mental retardation, hearing impairments (including deafness), speech or language impairments, visual impairments (including blindness), serious emotional disturbance (hereinafter referred to as "emotional disturbance"), orthopedic impairments, autism, traumatic brain injury, other health impairments, or specific learning disabilities; and (ii) who, by reason thereof, need[ ] special education and related services.

20 U.S.C. § 1401(3)(A); *see also* 20 U.S.C.A. § 1400; *MM ex rel. DM v. Sch. Dist. of Greenville Co.*, 303 F.3d 523, 526 (4th Cir.2002). To receive federal funding under IDEA, the state must provide all children with disabilities a FAPE. 20 U.S.C. §§ 1400(c), 1412(a)(1). The FAPE must be "calculated to confer some educational benefit on a disabled child." *MM*, 303 F.3d at 526; 20 U.S.C. § 1401(8); *see also Bd. of Ed. of Hendrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 189, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982) ("[W]hatever Congress meant by an 'appropriate' education, it is clear that it did not mean a potential-maximizing education."); *Hartmann v. Loudoun County Bd. of Ed.*, 118 F.3d 996, 1001 (4th Cir.1997) ("States must ... confer some educational benefit upon the handicapped child, but the Act does not require the furnishing of every special service necessary to maximize each handicapped child's potential.") (internal citations and quotation marks omitted).

To assure that students with disabilities receive FAPEs, the IDEA requires that school districts provide an individualized education program ("IEP") for each disabled child. 20 U.S.C. § 1414(d). The IEP is to be formulated by an IEP Team consisting of the child's parents, one of the student's regular teachers, a special education teacher, a representative of the school board, an individual who can interpret evaluation results and, whenever appropriate, the disabled child. *Id.* § 1414(d)(1)(B). An IEP must detail the student's current educational status, set forth annual goals for the student's education and state the special educational services and other aids that will be provided to the child as well as the extent to which the child will be mainstreamed. *Id.* § 1414(d)(1)(A).

The IDEA also establishes a framework for review of the IEP, which is "designed to ensure that the parents or guardian of a child with a disability are both notified of decisions affecting their child and given an opportunity to object to those decisions." *MM*, 303 F.3d at 527 (internal quotation marks and citation omitted); *see also* 20 U.S.C. § 1415. If the parents are not satisfied with the IEP, they may "present complaints with respect to any matter related to the identification, evaluation, or educational placement of the child, or the provision of a [FAPE] to such a child." *Id.* § 1415(b)(6). After such a complaint has been received, the parents also are entitled to request a due process hearing conducted by the state or local educational agency. *Id.* § 1415(f). In South Carolina, that hearing is conducted before a Local Hearing Officer ("LHO") and is appealable to a State Reviewing Officer ("SRO"). 24 S.C.Code Ann. Regs. § 43–243. Any party aggrieved by the findings and decision of a SRO may then bring suit in state or federal court. *See id.*

When a state receiving IDEA funding fails to provide a FAPE, the child's parent may remove the child to a private school and then seek tuition reimbursement from the state. *Florence Co. Sch. Dist. Four v. Carter*, 510 U.S. 7, 114 S.Ct. 361, 126 L.Ed.2d 284 (1993); *Sch. Comm. of Burlington v. Dep't of Ed.*, 471 U.S. 359, 369–70, 105 S.Ct. 1996, 85 L.Ed.2d 385 (1985). The parent may recover tuition reimbursement if: (1) the proposed IEP was inade-

quate to offer the child a FAPE and (2) the private education services obtained by the parents were appropriate to the child's needs. *Id.* at 370, 105 S.Ct. 1996.

## B. Background Facts

The facts related to Sean's medical background and educational services are not in dispute. Sean has had a history of respiratory problems throughout his childhood and adolescence. Following an asthma attack in the seventh grade, the School District formulated a Section 504 Accommodation Plan ("the Accommodation Plan" or "the Plan") pursuant to the Rehabilitation Act of 1973, 29 U.S.C. § 794, determining Sean's disabling condition to be "severe allergies—environmental asthma." Sean's parents ("the Tracys") signed the Accommodation Plan, indicating their agreement with its contents. With one minor modification, the Accommodation Plan was transferred to the Hilton Head High School ("the High School") when he began attending school there in the ninth grade.[1]

### 1997–1998 School Year

During his ninth grade year (1997–98), Sean had bronchitis four times. From November 10 through November 24, 1997, he was placed on "medical homebound instruction" because of sinusitis.

On April 21, 1998, Sean's Accommodation Plan was modified to reflect the following disabling condition: "asthma & the medications which may cause mood swings, hyperactivity and aggression." (A.R. at 1593.) The Plan noted that Sean's asthma attacks may result in being absent from class and that the medications could make him "distractible, unable to concentrate and impulsive." The Plan provided that Sean would be seated near the teacher "if necessary" and that he would be

permitted to take essays and tests in the resource room with assistance from the resource teacher. It further stated that the Tracys were to communicate concerns to the teacher(s)/counselor; inform teacher(s)/counselor of medication changes; and get feedback from teacher(s)/counselor to give to Sean's physician for check-ups. Sean was instructed to complete the assignment notebook; take medication as prescribed; come to class with books, pencil and paper; complete assigned work; request assistance when needed; take needed materials home to complete work; and attend supervised after-school tutoring as needed. (A.R. at 1593–96.) The Tracys signed this Plan, as did the other members of the 504 Team. (A.R.)

In July 1998, at the end of Sean's ninth grade year, Mrs. Tracy took Sean to the Medical University of South Carolina ("MUSC"), Department of Pediatrics, Division of Genetics and Child Development, to be evaluated. Mrs. Tracy sought this evaluation because she was concerned with Sean's grades and wanted to "rule out the possibility of any learning difficulties or dyslexia along with any other behavioral issues such as distractibility and poor impulse control that may be interfering with his academic learning." (Mot.App. at 4.)

The evaluation was conducted by Dr. Jeffrey Craver and Dr. Jane Charles ("the MUSC evaluation"). Dr. Craver, a clinical psychologist, administered a test of intellectual functioning, the Wechsler Intelligence Scale for Children, Third Edition ("WISC–III"), and an achievement test, the Woodcock–Johnson Achievement Battery ("Woodcock–Johnson"). Mrs. Tracy completed an Achenbach Child Behavior Checklist to help assess Sean in areas of behavioral, personal, and social concern.

---

1. The Accommodation Plan was changed to reflect that, if Sean needed to see the school nurse, the teacher in charge was to call the nurse, who would transport Sean by wheelchair. Prior to this change, Sean was to be accompanied by another student.

Based on the test results, Dr. Craver opined that Sean was not learning disabled but that he could be characterized as a child with a disability under the "other health impaired" classification ("OHI").[2] Dr. Craver stated:

> Sean does not fit the traditional profile of a student with a learning disability. He, however, does demonstrate some difficulties in regard to verbal information processing and verbally responding to tasks. In addition, he clearly has weaker skills in reading comprehension. When these skills are taken into consideration along with the fact that he has had numerous medical complications due to asthma and chronic allergies ... [i]t is strongly recommended that appropriate school personnel consider him for placement in a Special Education Program under the classification of Other Health Impaired (OHI) .... Ideally by allowing Sean to be served under the OHI designation a special education teacher could provide services which may be conducive to increased success within the academic setting.

(Mot.App. at 5; A.R. at 1638–39.)

### 1998–1999 School Year

In August 1998, Mrs. Tracy provided the School District with a copy of the MUSC evaluation. Barbara Hunt, the special education chairperson, shared the evaluation with Dr. Patrick Owen, the school's psychologist. Dr. Owen agreed with the OHI recommendation in the MUSC evaluation. (Mot.App. at 6.)

On October 7, 1998, Mrs. Tracy met with the District to review the MUSC evaluation. At that time, the District provided Mrs. Tracy with a notice of rights handbook under the IDEA. (Mot.App. at 7.) The District also provided a notice of an IEP meeting for October 21, 1998. (Mot App. at 7.)

At the October 7 meeting, the District placed Sean on homebound instruction as a result of his respiratory problems and the lack of a properly functioning air conditioning system in the school. (Mot.App. at 7.) On October 21, 1998, the IEP Team developed an IEP for Sean, which is the only one ever adopted during his time at Hilton Head High School. The IEP Team designated Sean as OHI and placed him on homebound instruction on an as-needed basis.[3] (Mot.App. at 8.)

The IEP contained two annual goals, as well as short-term objectives under each goal. The first goal was "[t]o receive tutorial support with regular class placements and keep up with course work." Three short-term objectives were listed under

---

**2.** The IDEA's definition of "disability" includes children with "other health impairments." 20 U.S.C. § 1401(3)(A) (emphasis added). According to the regulations, OHI means:

> having limited strength, vitality or alertness, including a heightened alertness to environmental stimuli, that results in limited alertness with respect to the educational environment, that—
> (i) Is due to chronic or acute health problems such as asthma, attention deficit disorder or attention deficit hyperactivity disorder, diabetes, epilepsy, a heart condition, hemophilia, lead poisoning, leukemia, nephritis, rheumatic fever, and sickle cell anemia; and

> (ii) Adversely affects a child's educational performance.
> 34 C.F.R. § 300.7(c)(9).

**3.** By designating Sean as OHI, the funding for homebound services and the number of hours of homebound instruction was increased. Initially, however, the District did not provide the designated number of hours of homebound instruction; nor did it provide a qualified biology teacher. (Mot.App. at 8.) The Tracys used a tutor (Ms. Tucker), whom the Tracys paid until the District started paying her as a homebound instructor. (Mot.App. at 8.) Ms. Tucker did not tutor in math or biology. (Mot.App. at 8.)

this goal: "Sean will be allowed to make up all work missed while absent in a timely manner (consult w/ teacher and Ms. Hunt)"; "Sean will attend after-school tutoring as needed to keep up with class work"; and "Sean will be allowed to come to Resource Room as needed for assistance w/ Tests, Quizzes, etc." (A.R. at 1644.) The IEP's second annual goal stated: "Sean will be enrolled in 8 credit-bearing classes—graduate with S.C. Diploma." The short-term objectives under this goal were: "Sean will attend all classes (when possible), follow all rules, regulations, and meet all class requirements"; "Sean will receive 10 hours of H.B. [home-based] per week when absent from school"; and "Sean will receive services from Guidance in planning schedule for classes and other issues related to school etc." (A.R. at 1645.)

The IEP provided that Sean would be served in an itinerant model, receiving 200 minutes per week of direct instruction in the regular education setting and 50 minutes per week of indirect services, which included assistance in the Resource Room as needed, and consultative services involving regular education teachers and the special education teacher. (A.R. at 1649.) The IEP also provided that Sean would receive supplementary aids and services, including tutoring as needed, and extra time to complete tests such as the SAT and PSAT. (A.R. at 1649.)

Mrs. Tracy was in attendance at the IEP meeting and approved the IEP by checking the statement on the final page of the IEP, which read: "I agree with the educational and related services to be provided to my child as delineated in the IEP." She also signed her name at the bottom of the page. (A.R. at 1651.)

Sean was on homebound instruction for much of the first nine weeks of the 1998–99 school year. (Mot.App. at 8.) When Sean returned to school, he experienced difficulties, including a number of unexcused absences. (Mot.App. at 8–9.) In mid-December, he flunked a biology test, left school, and walked home in the rain. His mother found him in bed, and Sean had written a note saying that "he could not do it anymore." (Mot.App. at 9.) After this incident, Sean was prescribed Paxil, which is an anti-depressant. (Mot.App. at 9.)

On December 18, the District sent the Tracys a letter reviewing Sean's progress and noting that Sean had to fulfill various requirements to complete Photography II, Computer Applications, and Biology. The letter also discussed Sean's pattern of truancy, an in-school suspension that needed to be made up, and the implementation of an attendance contract. (Mot.App. at 9.) In response, the Tracys acknowledged that Sean's unexcused absences were a problem, but they expressed concern over the District's failure to provide the full extent of homebound instruction promised under the IEP. (Mot.App. at 9.) In February, the District provided Sean with a Biology homebound instructor. (Mot.App. at 10.) In May, Sean received credit for passing Biology. (Mot.App. at 10.)

Throughout the school year, Sean continued to have a problem with truancy. (Mot.App. at 10.) His unexcused absences were not related to any underlying disability. (Mot.App. at 10.) Instead, Sean would leave school with friends during the school day. (Mot.App. at 10.) The school referred the truancy problem to the courts on more than one occasion, but Mrs. Tracy told the school in April or May of 1998 that there was no need to pursue the truancy charges because they were going to withdraw Sean from Hilton Head High School and send him to boarding school. (Mot. App. at 11.)

On May 11, Mrs. Tracy informed Sean's teachers that he would be missing school

that Friday to attend an interview for boarding school in Virginia. Sean's photography teacher, Patty Schoelkopf responded with an email, which stated in pertinent part:

Sean has been doing virtually no work in my class. He has not gotten caught up from the last time we talked. The due dates have already passed on two major assignments .... I refuse to except [sic] anymore [sic] of them. I also am very tired of telling Sean what he owes me when he does nothing but wonder [sic] around during class. I honestly want nothing to do with him. He doesn't seem to care so neither do I ....

I suppose my whole point is that you wrote that letter to all of his teachers and I am not sure if it really matters if he misses tomorrow or not since he does virtually nothing in my class anyway ....

Patty Schoelkopf

PS—I hope he has a better time and is more successful at the boarding school.

(Mot.App. at 11–12.) Mr. Tracy testified that this email cemented the decision to remove Sean from the Hilton Head High School. (Mot.App. at 12.) At the end of the year, Sean had a 2.42 GPA and had passed all of his classes except Photography, in which he received an incomplete. (Mot.App. at 13.)

During Sean's freshman and sophomore years at the Hilton Head High School, he was smoking marijuana regularly, was dependent on alcohol, and had experimented with LSD. (Mot.App. at 14.) The Tracys became aware of Sean's drug use at some point between his freshman and sophomore years. (Mot.App. at 14.)

The Tracys withdrew Sean from Hilton Head High School at the end of his sophomore year, in June of 1999. In addition to the Tracys' concerns about Sean's health and academic performance, they stated that the decision to remove Sean from Hilton Head High School was based on their dislike of his peer group. (Mot.App. at 15.)

### 1999–2000 School Year

The Tracys enrolled Sean at Oak Hill Academy in August of 1999. Sean left Oak Hill in September 1999 because the school's headmaster felt that the school was not capable of handling Sean's problems. (Mot.App. at 15.)

In September 1999, the Tracys took Sean to Columbia, South Carolina to be evaluated by Grant Price and Dr. Mark Sloan of the Price Group ("the Price Group Evaluation"). (Mot.App. at 16.) The Price Group Evaluation indicated that Sean was not suffering from Attention Deficit Disorder or from a learning disability. The Evaluation indicated that Sean was suffering from some emotional problems, including mild depression. The Price Group advised the Tracys that Sean would benefit from a therapeutic boarding school where Sean might receive counseling in addition to his educational programs. (A.R. at 2264–65.) The Tracys did not inform the School District of the Price Group Evaluation until the following year.

As the result of a referral from the Price Group, the Tracys sent Sean to Northwoods School in Idaho. On the Monday morning after they took Sean to Northwoods, the Tracys were informed that he had run away and was missing. (Mot.App. at 17.) A few days later, Sean contacted his parents from Spokane, Washington. (Mot.App. at 18.) The Tracys arranged for officials from Westshield Adolescent Services to escort Sean from Washington to the SUWS Adolescent Program in Gooding, Idaho ("SUWS").

SUWS is a wilderness program that lasts several weeks. (Mot.App. at 18.) Sean was enrolled for the purpose of "ex-

plor[ing] the emotional and behavioral dynamics related to [his] presenting problems." (Mot.App. at 18.) His presenting problems were "strained family relationships, impulsive behavior, defiance, declining academic performance, increasing depression and acting out behaviors, trouble with the law, and drug and alcohol use." (Mot.App. at 18.)

Sean successfully completed the first portion of the SUWS program, and SUWS advised the Tracys that Sean needed additional treatment. (Mot.App. at 18.) Sean attended the SUWS program for approximately three weeks. (Mot.App. at 18.) The program advised that Sean receive further treatment in a "structured environment" for the purpose of providing "a clearer understanding of his emotional needs and to continue developing healthier coping skills and behaviors." (Mot.App. at 19.)

On November 10, 1999, Sean was enrolled in the Island View residential treatment facility in Utah. His initial psychiatric evaluation listed three treatment goals: (1) to have a better relationship with his family; (2) to strengthen his self concept and find out more about his self; and (3) to develop appropriate coping skills. (Mot. App. at 19.) Sean successfully completed the program at Island View and attended Island View for the balance of his junior year. He completed the eleventh grade in July 2000 with a GPA of 2.76. (Mot.App. at 19–20.)

### 2000–2001 School Year

In July 2000, the Tracys contacted the School District about Sean for the first time since his withdrawal in June of 1999. The Tracys requested a meeting with the District's Assistant Superintendent for Student Services. At the meeting, the Tracys asked, for the first time, for financial assistance from the District to pay for Sean's private school placements. The Tracys provided the District with a copy of the Price Group Evaluation but did not provide any other treatment records.

On August 4, 2000, counsel for the Tracys sent a letter to the School District requesting a due process hearing. The letter indicated that the Tracys were seeking "reimbursement for unilateral out-of-district residential placement" and "reimbursement for all outside evaluations paid for by the parents and used by the IEP team." (Mot.App. at 21.)

On September 14, 2000, the Tracys enrolled Sean at Monteverde Academy. (Mot.App. at 22.) A few days later, the Tracys' counsel spoke to the District's counsel and informed the District that Sean was placed at Monteverde Academy and that the Tracys wanted an IEP Team meeting to discuss reimbursement for the placement. (Mot.App. at 23.)

The IEP Team convened on October 3, 2000 to develop a new IEP for Sean. (Mot. App. at 23.) The meeting was adjourned when counsel for the Tracys agreed to provide the District with documents relating to Sean's medical treatment and therapy notes. (Mot.App. at 23.)

Sean graduated from Monteverde and received his high school diploma while the due process period was still pending. He had an overall cumulative GPA of 3.1667. (Mot.App. at 24.)

### C. Procedural History

The Tracys initiated an administrative action to recover reimbursement from the School District for all costs associated with Sean's private, residential placements during the 1999–2000 and 2000–2001 school years, in the amount of $97,135.25. (A.R. at 2343, 2858.) Local Hearing Officer David Thomas ("LHO") conducted the initial hearing. At the Tracys' request, the hearing was bifurcated to separately address each prong of the *Burlington/Carter* test governing reimbursement of private placement costs. After a five-day hearing,

the LHO ruled that the School District had denied Sean a FAPE, satisfying the first prong of the *Burlington/Carter* test. The LHO conducted a two-day hearing on the second prong of the *Burlington/Carter* test—whether the various private placements that Sean attended during the 1999–2000 and 2000–2001 school years were "proper" under the IDEA. The LHO found that only the Montverde Academy, which Sean attended during the 2000–2001 school year, was proper under the Act. Therefore, the LHO awarded reimbursement in the amount of $20,937.87, the costs associated with the Montverde placement.

The School District filed an appeal of this decision with the SRO, seeking reversal of the LHO's determination that the District failed to provide Sean with a FAPE and that portion of the LHO's decision awarding the Tracys benefits for the Montverde placement. The Tracys also appealed the LHO's decision, challenging those aspects of the decision that denied them approximately $80,000 in costs for Sean's private evaluations and placements during the 1999–2000 school year.

After considering the entire record, as well as appellate briefs submitted by both parties, the SRO issued a decision reversing the LHO's determination that Sean was denied a FAPE. The SRO denied the Tracys' reimbursement claim in its entirety. The Tracys then instituted the present action for judicial review. The parties have filed cross-motions for summary judgment. The record includes the official Administrative Record (designated by references to "A.R."), as well as a Motion Appendix containing excerpts from that record (designated by references to "Mot. App.").

## DISCUSSION

### A. Summary Judgment Standard

To grant a motion for summary judgment, the court must find that "there is no genuine issue as to any material fact." Fed.R.Civ.P. 56(c). The judge is not to weigh the evidence but rather to determine if there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

### B. Standard of Review

"Generally, in reviewing state administrative decisions in IDEA cases, courts are required to make an independent decision based on a preponderance of the evidence, while giving due weight to state administrative proceedings." *Doyle v. Arlington Co. Sch. Bd.*, 953 F.2d 100, 103 (4th Cir. 1991). The Fourth Circuit has recently reiterated the limited scope of this review. *A.B. v. Lawson*, 354 F.3d 315, 325 (4th Cir.2004). The administrative findings "are entitled to prima facie correctness," and to the extent that the court decides not to follow those findings, it "is required to explain why it does not." *Doyle v. Arlington County Sch. Bd.*, 953 F.2d 100, 105 (4th Cir.1991). The Supreme Court has cautioned that courts should not "substitute their own notions of sound educational policy for those of the school authorities they review." *Id.* at 106.

■ Where the administrative proceedings are two-tiered, as in South Carolina, and "the Hearing Officer and Reviewing Officer have reached the same conclusion, a reviewing court is obliged to accord greater deference to their findings." *MM*, 303 F.3d at 531 (citing *Combs v. Sch. Bd. of Rockingham Co.*, 15 F.3d 357, 361 (4th Cir.1994)). Where the Hearing Officer and the Reviewing Officer reach different results, the Reviewing Officer must provide sound reasons for departing from the Hearing Officer's findings. *See Springer v. Fairfax Co. Sch. Bd.*, 134 F.3d 659, 663

n. * (4th Cir.1998). On the other hand, where a Reviewing Officer reaches a factual conclusion opposed to one reached by the Hearing Officer and, in doing so, deviates from the normal process of fact-finding, the Reviewing Officer's decision may be entitled to little or no deference.[4] *Doyle v. Arlington County Sch. Bd.,* 953 F.2d 100, 105–06 (4th Cir.1991).

### C. Analysis

As noted above, *supra* at 679–80, school districts may be required to pay for education at private institutions if the educational services provided by the district do not amount to a FAPE. *School Comm. of Burlington v. Dep't of Ed.,* 471 U.S. 359, 105 S.Ct. 1996, 85 L.Ed.2d 385 (1985). In *Florence Co. Sch. Dist. 4 v. Carter,* 510 U.S. 7, 114 S.Ct. 361, 126 L.Ed.2d 284 (1993), the Supreme Court held that such reimbursement is available only if it is found both that "the public placement violated the IDEA and that the private school placement was proper under the Act." *Id.* at 15, 114 S.Ct. 361. The court will address each part of this analysis in turn.

### 1. FAPE

As defined in the IDEA, a FAPE includes both instruction designed to suit the needs of the disabled child and "related services," 20 U.S.C.A. § 1401(a)(18), which encompass "such developmental, corrective, and other supportive services ... as may be required to assist a child with a disability to benefit from special education," *id.* at § 1401(a)(17). The Supreme Court held in *Rowley* that a court's inquiry in evaluating whether a FAPE has been provided is two-fold: the court must determine whether the State complied with the procedures set forth in the Act and then determine whether the IEP developed through the Act's procedures was "reasonably calculated" to enable the child to receive educational benefits. *Rowley,* 458 U.S. at 206–07, 102 S.Ct. 3034; *G v. Fort Bragg Dependent Sch.,* 324 F.3d 240, 248 (4th Cir.2003).

### October 1998 IEP

The LHO concluded that the School District committed a "serious procedural error" in formulating the October 1998 IEP by denying the Tracys "full participation" in the IEP process. Specifically, the LHO took issue with the fact that Brenda Hunt, a special education teacher at the Hilton Head High School, drafted an IEP prior to the IEP meeting on October 21, 1998. (A.R. at 33, 38–39, 42.)

■■■ As the SRO found, the LHO's conclusion that the Tracys were denied adequate participation in the IEP process is not supported by the evidence of record and does not provide a proper basis for finding that Sean was denied a FAPE.[5] The evidence shows that Mrs. Tracy met with Hunt and other members of the IEP

---

**4.** Plaintiffs suggest that the Hearing Officers were biased, apparently in an effort to have this court disregard the findings of each. (Pls.' Mem. Supp. S.J. at 1 (reciting statistics as to percentage of cases in which the Hearing Officers rule in favor of the School District in IDEA cases)); (Bowers Aff. at 1 (same).) Even assuming this evidence is properly before the court, it is insufficient to rebut the presumption of impartiality to which both Hearing Officers are entitled. *See, e.g., Cavanagh v. Grasmick,* 75 F.Supp.2d 446, 461 (D.Md.1999) (" '[A]dministrative decisionmakers, like judicial ones, are entitled to a presumption of honesty and integrity,' absent a showing of bias from 'extrajudicial sources' such as those indicated by 34 C.F.R. 300.508(a)." (quoting *Morris v. City of Danville,* 744 F.2d 1041, 1045 (4th Cir.1984))).

**5.** *Doyle v. Arlington* does not require a decision in favor of the LHO's conclusion. Unlike in *Doyle,* the LHO in this case has "no special claim to deference" with respect to those issues on which the LHO and SRO differed. *Springer,* 134 F.3d at 663 n. *. There, the LHO and the SRO reached opposite conclusions on the credibility of one of the witnesses, who had testified before the LHO but

Team informally on October 7 to discuss the MUSC evaluation and placement options for Sean. With Mrs. Tracy's consent, Hunt then drafted a proposed IEP, incorporating Mrs. Tracy's concerns and suggestions, and used the draft IEP as a starting point for discussion at the October 21 meeting. Nothing in the IDEA or its implementing regulations precludes the school officials from meeting informally, reviewing the medical evaluations, discussing placement options with the parents, or creating a draft IEP proposal prior to the formal IEP meeting. *See Doyle v. Arlington County Sch. Bd.*, 806 F.Supp. 1253, 1262 (E.D.Va.1992), *aff'd* 39 F.3d 1176 (1994) ("[W]hile a school system must not finalize its placement decision before an IEP meeting, it can, and should, have given some thought to that placement."); *Berger v. Medina City Sch. Dist.*, 348 F.3d 513, 525 (6th Cir.2003) ("[T]he fact that school personnel conferred informally before the May 1999 meeting, formulated opinions, and came to the meeting with recommendations concerning Travis's placement for the following year does not demonstrate either a violation of the IDEA, or 'serious infringement' of plaintiffs' right to participate in the IEP meeting."); *White v. Sch. Bd. Henrico Co.*, 36 Va.App. 137, 549 S.E.2d 16, 27 (2001) ("The IDEA permits a school board to bring a draft IEP to meetings for the purposes of discussion."); 34 C.F.R. § 300.345 (describing parental involvement in developing IEP). Importantly, there is nothing in the record to suggest that the School District "predetermined" Sean's placement and/or services prior to the October IEP Team meeting. *See Spielberg v. Henrico Co. Pub. Sch.*, 853 F.2d 256, 259 (4th Cir.1988) (holding that predetermining a child's placement before developing an IEP violates the parental participation requirements of the IDEA). Nor is there any suggestion in the record that Mrs. Tracy was forced to accept the proposed IEP, was unaware of her rights in formulating the IEP, or was otherwise denied meaningful participation in the IEP process. To the contrary, at the due process hearing, Mrs. Tracy acknowledged that she had significant input in the development of the IEP. Mrs. Tracy was notified of the IEP meeting in writing and by telephone, (A.R. at 1655–56), she was provided with a handbook of rights regarding the IEP process, (A.R. at 684–85, 2352), she attended the IEP meeting, she submitted the MUSC evaluation for consideration, and she was *successful* in obtaining her sought-after classification for Sean— the OHI classification. In fact, Mrs. Tracy checked a box on the IEP itself stating that she had "participated *as an equal member of the committee in developing this IEP* and in determining the least restrictive environment and placement for my child." (A.R. at 1651 (emphasis added).) This is simply not a case where placement was predetermined or where parental involvement was curtailed or impeded in any meaningful way.[6]

not before the SRO. Here, by contrast, the LHO's conclusions turned not on witness credibility but on the inferences to be drawn from the Tracys' evidence and the weight to be given to that evidence, inquiries "which both the LHO and SRO are required to make independently." *Id.* The LHO specifically stated that it was basing its findings on the "paper trail" of evidence, and not on any credibility determination. (A.R. at 38.) Additionally, as in *Springer*, the SRO undertook a thorough and careful analysis and provided sound reasons for departing from the LHO's findings in each instance. *Id.*

6. The LHO also stated that the District acted improperly by relying upon the MUSC evaluation rather than conducting its own evaluation. (A.R. at 32–33.) The LHO cited no statutory or regulatory support for this proposition, and this court is aware of none. The IDEA mandates that independent evaluations procured by parents be given full consideration in the IEP process; it does not require

■ The SRO was also correct in concluding that the School District complied with the "child find" identification and evaluation requirements set forth in the IDEA. *See* 20 U.S.C. § 1412(a)(3) (requiring states to ensure that "[a]ll children with disabilities residing in the State ... are identified, located, and evaluated and a practical method is developed and implemented to determine which children with disabilities are currently receiving needed special education and related services"). The Tracys argue that Sean should have been classified as emotionally disturbed, thereby entitling him to special education services beyond those offered under his OHI classification.[7] However, the School District had no reason to suspect that Sean was suffering from a serious emotional disturbance within the meaning of the federal and state regulations implementing the IDEA, or any disability other than that related to his severe asthma and allergies.

Emotional disturbance is defined by the implementing regulations as follows:

(i) The term means a condition exhibiting one or more of the following characteristics *over a long period of time and to a marked degree that adversely affects a child's educational performance:*

(A) An inability to learn that cannot be explained by intellectual, sensory, or health factors.

(B) An inability to build or maintain satisfactory interpersonal relationships with peers and teachers.

(C) Inappropriate types of behavior or feelings under normal circumstances.

(D) A general pervasive mood of unhappiness or depression.

(E) A tendency to develop physical symptoms or fears associated with personal or school problems.

(ii) The term includes schizophrenia. *The term does not apply to children who are socially maladjusted, unless it is determined that they have an emotional disturbance.*

34 C.F.R. § 300.7(c)(4) (emphasis added). During the time that Sean was enrolled in public school, he engaged in unruly conduct, such as alcohol and drug abuse, but there was no indication that this conduct was the result of anything other than social maladjustment. As the Fourth Circuit has noted, "[c]ourts and special education authorities have routinely declined ... to equate conduct disorders or social maladjustment with serious emotional disturbance." *Springer*, 134 F.3d at 664. "Any definition that equated simple bad behav-

that the District conduct its own evaluations where there is no indication that there is a need for additional testing. 34 C.F.R. § 300.502(c)(1); 20 U.S.C. § 1414(c)(1)(B)(iii) (providing that the IEP Team has full discretion to "identify what additional data, if any, are needed to determine ... whether the child needs special education and related services").

Additionally, as is discussed below, the Tracys have not demonstrated that any violation of a procedural requirement of the IDEA (or one of its implementing regulations) "actually interfere[d] with the provision of a FAPE." *DiBuo v. Bd. of Ed. of Worcester Co.*, 309 F.3d 184, 190–91 (4th Cir.2002). To the extent that the LHO concluded that the District's

purported procedural errors constituted a *per se* denial of a FAPE to Sean, the LHO committed an error of law. (A.R. at 44); *Dibuo*, 309 F.3d at 190–91 (rejecting "a broad legal rule to the effect that a procedural violation of the IDEA (or one of its implementing regulations) that causes interference with the parents' ability to participate in the IDEA process *per se* constitutes a denial of a FAPE to the disabled child at issue.").

7. The Tracys also suggested that Sean should have been classified as learning disabled. There is no evidentiary support whatsoever for this position. All of the medical records specifically rule out a learning disability, including the MUSC evaluation, which the IEP Team consulted in developing Sean's IEP.

ior with serious emotional disturbance would exponentially enlarge the burden IDEA places on state and local education authorities. Among other things, such a definition would require the schools to dispense criminal justice rather than special education." *Id.* Thus, the mere fact that Sean engaged in delinquent behavior did not put the School District on notice that he possibly was suffering from a serious emotional disturbance.

■ Moreover, nothing in the record indicates that Sean exhibited one or more of the five qualifying characteristics for emotional disturbance "over a long period of time and to a marked degree." 34 C.F.R. § 300.7(c)(4). Sean was personable and was well-liked by his teachers and fellow students, and he got along well with both groups. (A.R. at 403–04, 1021, 1079–80, 1085, 1088–89, 1166, 1174–75); 34 C.F.R. § 300.7(b)(9)(i)(B) (describing inability "to build or maintain satisfactory interpersonal relationships with peers and teachers" as one qualifying criteria). At school, Sean did not demonstrate verbal aggression, physically assaultive behavior, authority conflicts, depression, despondency, mood swings, or other conduct typically associated with emotional disturbance. (A.R. at 1174–75, 2431–34.) Although Sean had bouts with depression, there is no evidence of "a general pervasive mood of unhappiness or depression" while Sean was enrolled at Hilton Head High School. 34 C.F.R. § 300.7(b)(9)(i)(D).

■ Furthermore, even if the Tracys were able to satisfy the temporal and severity factors for emotional disturbance status, they still have failed to establish "the critical causal connection between this condition and the educational difficulties" Sean experienced, which is "the final step in proving a serious emotional distur-

bance." *Springer*, 134 F.3d at 666 (citing § 300.7(b)(9)(i)). Prior to his ninth grade year, Sean made steady educational progress,[8] and he continued to advance from grade to grade on schedule both before and during his time at the Hilton Head High School. *Cf. Rowley*, 458 U.S. at 209–10, 102 S.Ct. 3034 (evidence that student was advancing from grade to grade indicated educational progress). Although Sean's grades suffered in the ninth and tenth grades, the evidence shows that it was during these years that he began to have a problem with truancy, drugs and alcohol, and engaged in other criminal activities. (A.R. at 503, 529–31, 2518–19, 2524.) The drop in Sean's grades at this time therefore "appears to be directly attributable to his truancy, drug and alcohol use, and delinquent behavior rather than to any emotional disturbance." *Springer*, 134 F.3d at 666. There is nothing in the record to suggest that Sean's behavior should have alerted the School District that he was suffering from a serious emotional disturbance within the meaning of the IDEA; thus, the District did not violate its "child find" duty by failing to identify and evaluate him as such.

■■ Turning to the substance of the IEP, the court must determine whether the IEP developed through the Act's procedures was "reasonably calculated" to enable Sean to receive meaningful educational benefit. *Rowley*, 458 U.S. at 206–07, 102 S.Ct. 3034. The LHO found that, regardless of whether the IEP was designed to afford Sean a FAPE, it was not implemented appropriately to "enable Sean to receive full benefit." (A.R. at 39, 42.) As the SRO concluded, the "full benefit" standard applied by the LHO is im-

---

8. During his elementary years, Sean received grades of As and Bs. During his middle school years, he received primarily Bs and Cs, with some As and two Ds in the eighth grade. (A.R. at 1790.)

proper and led to an erroneous finding that Sean was denied a FAPE.

The IDEA defines "FAPE" as an education that, among other things, "is provided in conformity with the IEP." 20 U.S.C. § 602(8)(4); 20 U.S.C. § 1401(8)(4). The IEP must be "reasonably calculated" to confer educational benefit. *Rowley*, 458 U.S. at 206–07, 102 S.Ct. 3034. Similarly, the IEP must actually be implemented in such a way as to "provide educational benefit." *G*, 324 F.3d at 251–53. Through the IDEA, "Congress intended to provide a satisfactory level of educational opportunity, not the best education that money could buy." *A.B.*, 354 F.3d at 319 (citing *Rowley*, 458 U.S. at 189, 102 S.Ct. 3034). "[W]hatever Congress meant by an 'appropriate' education, it is clear that it did not mean a potential-maximizing education." *Id.* (citing *Rowley*, 458 U.S. at 197 n. 21, 102 S.Ct. 3034; *Hartmann v. Loudoun County Bd. of Ed.*, 118 F.3d 996, 1001 (4th Cir.1997) ("States must ... confer some educational benefit upon the handicapped child, but the Act does not require the furnishing of every special service necessary to maximize each handicapped child's potential.")). In *Tice v. Botetourt County Sch. Bd.*, 908 F.2d 1200 (4th Cir.1990), the Fourth Circuit held that "once a procedurally proper IEP has been formulated, a reviewing court should be reluctant indeed to second guess the judgment of education professionals." *Id.* at 1207.

Here, it is clear that Sean's IEP was both developed and implemented in accordance with *Rowley's* substantive standard. The IEP itself was individualized on the basis of his assessment and performance. The District provided Sean with significant homebound instruction, offered extensive tutorial support, provided ample Resource Room time, and allowed Sean to make up all of the work that he missed during his excused absences from school. It is true that not all of the homebound instruction that Sean was supposed to receive was delivered in a timely manner. (A.R. at 695–96.) However, all such instruction was eventually provided before the end of the 1998–99 school year, and Sean received passing grades for all of his courses except Photography. (A.R. at 695–98, 1159–60, 1165, 1777.) Sean was promoted to the eleventh grade at the end of his tenth grade school year, and the Tracys did not object to either the substance or the implementation of the IEP at any time during the 1998–99 school year. (A.R. at 135–36; 2071; 2615; 2637.)

■ The Tracys next argue that Sean's placement during the 1998–99 school year violated the IDEA's requirement that disabled children be placed in the least restrictive environment necessary to achieve the FAPE. *A.B.*, 354 F.3d at 319 ("In addition to IDEA's requirement that the state provide each student with some educational benefit, the student must be placed in the least restrictive environment to achieve the FAPE."); 20 U.S.C. § 1412(a)(5)(A) (the disabled child is to participate in the same activities as non-disabled children to the "maximum extent appropriate"); *see also* 34 C.F.R. § 300.550 ("That special classes, separate schooling or other removal of children with disabilities from the regular educational environment occurs only when the nature or severity of the disability is such that education in regular classes cannot be achieved satisfactorily.").

■ Sean's IEP provided for an itinerant placement with substantial mainstreaming and homebound instruction on an "as needed" basis. For most of the first nine weeks of the 1998 school year, Sean received homebound instruction due to a combination of his respiratory problems and a malfunctioning air conditioning system at the High School. The SRO concluded that, given Sean's illnesses and

the High School's air conditioning problems, there was no evidence of a feasible or appropriate placement for Sean other than homebound instruction during this time period.[9] (Mot.App. at 46.)

The Tracys have not established any basis to set aside this conclusion. Sean's IEP was carefully tailored to ensure that he was mainstreamed "to the maximum extent appropriate." 20 U.S.C. § 1412(5)(B). "The IDEA encourages mainstreaming, but only to the extent that it does not prevent a child from receiving educational benefit." *Hartmann v. Loudoun Co. Bd. of Educ.*, 118 F.3d 996, 1005 (4th Cir.1997). Sean's disability precluded him from being educated in a non airconditioned setting. There is no evidence that any accommodation for his disability other than homebound instruction during the time that the air-conditioning at the High School was broken was feasible or appropriate. *Id.* at 1001, 1005.

### October 2000 IEP Meeting

■ At the hearing before the LHO, the Tracys also argued that the School District violated the IDEA by failing to develop a new IEP for Sean prior to the beginning of the 2000–2001 school year. It appears that the Tracys have since abandoned this argument. To the extent that it has been preserved, this court would find it to be without merit.

The Fourth Circuit has held that a school district "is only required to continue developing IEPs for a disabled child no longer attending its schools when a prior year's IEP for the child is under administrative or judicial review." *MM*, 303 F.3d at 536. The Tracys unilaterally withdrew Sean from the School District in June of 1999, and they did not seek any review of the October 1998 IEP. Thus, the School District was under no obligation to review or modify Sean's IEP for the 1999–2000 school year.

■ Moreover, any failure by the School District to complete an IEP for the 2000–2001 school year was the result of the Tracys' refusal to cooperate in formulating an IEP. *See MM*, 303 F.3d at 535 ("[T]he court properly concluded that 'it would be improper to hold [the] School District liable for the procedural violation of failing to have the IEP completed and signed, when that failure was the result of [the parents'] lack of cooperation.'"). At the beginning of the IEP meeting on October 3, 2000, the teacher chairing the meeting stated that her understanding of the meeting's purpose was to develop an IEP for Sean, "who will be returning to the high school." (A.R. at 2202–03.) At this point, counsel for the Tracys interrupted the teacher and said, "Stop. That's not the purpose of this meeting. That was never

---

9. The LHO's conclusion on this issue is difficult to discern. The LHO stated that the "School District has to bear a majority of the responsibility for causing Sean to be placed in what is not the Least Restrictive Environment—homebound" because "the absence of A/C in the months of August and September in humid, coastal southern South Carolina would be hurtful to a student without breathing and respiratory problems." (A.R. at 24, 40.) The LHO later stated, "[least restrictive environment] was not an issue in Phase I of the hearing process, but was addressed as an adjunct issues [sic] because it arose in the hearing and had bearing on and is not a component of the Decision or the Order arising from the Decision process." (A.R. at 54.) To the extent that the LHO found that the District violated the IDEA's requirement that Sean be placed in the least restrictive environment necessary to ensure a FAPE, the LHO engaged in an improper analysis. Significantly, the LHO did not suggest that there was evidence that accommodations other than homebound instruction were feasible, and he also did not suggest that there was evidence that it was feasible for the School District to repair the air conditioning system in a more timely fashion than was actually undertaken. (A.R. at 54 ("[T]he school did exhibit lack of *ability* and/or speed in correcting the AC problem.") (emphasis added).)

the requested purpose of the meeting. We specifically have asked for the meeting to approve an out-of-district placement for Sean." (A.R. at 2203.) Thus, the Tracys refused to cooperate or participate in the development of an IEP for the 2000–2001 school year.[10]

### 2. Private Placement

Having concluded that the SRO was correct in finding that Sean was not denied a FAPE, there is no need to proceed to the question of the appropriateness of the private placements. Nonetheless, the court will briefly address this issue as an alternate ground for concluding that Plaintiffs are not entitled to reimbursement for these placements.

■ The SRO and the LHO each determined that the private placements at Oak Hill, Northwoods, SUWS, Island View, and Oakley were not proper placements under the IDEA because the placements were necessitated by reasons other than educational ones. Because both administrative officers reached the same conclusion, this court is obliged to accord greater deference to their findings. *MM,* 303 F.3d at 531 (citing *Combs v. Sch. Bd. of Rockingham Co.,* 15 F.3d 357, 361 (4th Cir.1994)). The Tracys have not rebutted, or even attempted to rebut, the presumption of correctness that attaches to these findings. After conducting an independent review of the record, the court finds no basis to set aside the administrative findings with respect to these private placements.

■ With respect to the Montverde placement, the court agrees with the SRO

that this placement also was not proper under the IDEA. The LHO found to the contrary after summarily concluding that the reasons for placing Sean at Montverde were "primarily educational." (A.R. at 29.) "[A] unilateral private placement cannot be regarded as 'proper under the Act' when it does not, at a minimum, provide some element of special education services in which the public school placement was deficient." *Berger,* 348 F.3d at 523. Here, the Tracys have not pointed to any *special education service* that was provided at the Montverde placement but was lacking at the Hilton Head High School.

### 3. Notice

■ Finally, as a separate and independent basis for denying reimbursement, the SRO found that the Tracys failed to inform the District that they objected to the IEP before removing Sean from the public school. (A.R. at 152–53.) As amended, the IDEA explicitly provides that reimbursement for a private school placement may be reduced or denied if parents did not provide notice, either at the most recent IEP meeting prior to removal, or in writing 10 business days prior to removal of the child from the public school, "that they were rejecting the placement proposed by the public agency to provide a [FAPE] to their child, including stating their concerns and their intent to enroll their child in a private school at public expense." 20 U.S.C. § 1412(a)(10)(C)(iii)(I)(aa) (effective June 4, 1997).

On the present record, there is no dispute that the Tracys failed to provide the

---

**10.** Alternatively, even if the School District erred by failing to develop an IEP for the 2000–2001 school year, Sean suffered no prejudice because the Tracys have made clear that they had no intention of re-enrolling Sean in public school for that school year. (A.R. at 2319–21); *cf. MM,* 303 F.3d at 535

("[T]here is no evidence that MM's parents would have accepted any FAPE offered by the District that did not include reimbursement for the Lovaas program.... In these circumstances, MM suffered no prejudice from the District's failure to agree to her parents' demands.").

requisite notice. (Pls.' Mem. Supp. S.J. at 4.) Nor have the Tracys argued that any exception to the notice requirement applies.[11] Thus, the SRO did not err in refusing to award reimbursement on this basis.

### CONCLUSION

It is, therefore,

**ORDERED**, for the foregoing reasons, that Defendant's Motion for Summary Judgment is **GRANTED**. Plaintiffs' Motion for Summary Judgment is **DENIED**. Summary judgment is hereby entered in favor of Defendant.

AND IT IS SO ORDERED.

---

11. The IDEA does not require parents to meet the notice requirement if one of the following exceptions applies: "(I) the parent is illiterate and cannot write in English; (II) compliance ... would likely result in physical or serious emotional harm to the child; (III) the school prevented the parent from providing such notice; or (IV) the parents had not received notice ... of the notice requirement in clause (iii)(I)." 20 U.S.C. § 1412(a)(10)(C)(iv).